# In the United States Court of Federal Claims

No. 06-827C
Filed: December 10, 2009
**TO BE PUBLISHED**

*****************************************

|  |  |
|---|---|
| | Administrative Procedure Act, 5 U.S.C. § 706; |
| | Board for Correction of Naval Records; |
| | Default Judgment, RCFC 55(b)(2); |
| | Defense Officer Personnel Management Act, |
| |   Pub. L. No. 96-513, 94 Stat. 2835 § 624 (1980); |
| |   Pub. L. No. 90-179 (Dec. 8, 1967); |
| | Judgment on the Administrative Record, |
| |   RCFC 52.1; |
| FRANK J. PROCHAZKA, | Military Pay Act, 37 U.S.C. § 204; |
| | Motion to Dismiss, RCFC 12(b)(6); |
|   Plaintiff, | Remand, RCFC 52.2; |
| | Tucker Act, 28 U.S.C. § 1491(a)(1); |
| v. | 10 U.S.C. § 101 (b)(10), (d)(1), (d)(3); |
| | 10 U.S.C. § 634(a); |
| THE UNITED STATES, | 10 U.S.C. §§ 1401-1412; |
| | 10 U.S.C. § 1552(a)(3); |
|   Defendant. | 10 U.S.C. § 3927 (repealed 1981); |
| | 10 U.S.C. § 5596; |
| | 10 U.S.C. § 5600 (repealed 1996); |
| | 10 U.S.C. § 5788a (repealed 1981); |
| | 10 U.S.C. §§ 6371-86 *et. seq.* (repealed 1981); |
| | 10 U.S.C. §§ 6387-89 (repealed 1981); |
| | 10 U.S.C. § 8927 (repealed 1981); |
| | 10 U.S.C. § 6388(a), (b), (c) (1968)(as amended); |
| | Manual of Navy Officer Manpower and |
| |   Personnel Classifications, |
| |   NAVMILPERSCOM 158391, |
| |   Vol. 1, at A-2 (Sept. 25, 2009); |
| | NAVMILPERSCOM NOTICE 1821; |
| | SECNAVINST 1821.1 (Jan. 29, 1982); |
| | 31 U.S.C. § 1102; |
| | 32 C.F.R. § 723.9. |

*****************************************

**Thomas Andrew Coulter**, LeClair Ryan, P.C., Richmond, Virginia, Counsel for Plaintiff.

**Devin Andrew Wolak**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Joseph Robert Berger**, Dickstein Shapiro, LLP, Washington, D.C., Counsel for National Veterans Legal Service Program, Washington, D.C., *Amicus Curiae* In Support of Plaintiff.

## MEMORANDUM OPINION AND ORDER

**BRADEN,** *Judge.*

Plaintiff, a retired Captain in the United States Navy Judge Advocate General's Corps ("JAGC"), contends that the Navy erred in determining the date of his mandatory retirement. Accordingly, Plaintiff seeks a correction of his military records to reflect the proper date on which he should have been retired, together with accrued pay and benefits.[1]

The manner in which Plaintiff's mandatory retirement date was determined and reviewed is central to this case.  Therefore, a discussion of the applicable statutes and regulations is required before reciting the factual context of this dispute, the parties' arguments, and the resolution of the court.

## I.      APPLICABLE STATUTES AND REGULATIONS.

### A.       Regarding Navy Retirement Prior To September 15, 1981.

Prior to September 15, 1981, a Navy officer reached mandatory retirement, if the officer served for a statutorily defined maximum number of years for his/her grade (rank) before being selected for a promotion.  10 U.S.C. §§ 6371-86 (1976) (repealed 1981) (defining the maximum number of years of service for various type of Navy (and Marine Corps) officers).  The metric for calculating a Navy officer's mandatory retirement date under this statutory scheme was years of "total commissioned service."   10 U.S.C. §§ 6387-89 (1976) (repealed 1981).   For JAGC officers, total commissioned service was calculated as:

> the total commissioned service of each officer *initially appointed in the grade of lieutenant (junior grade) or ensign in any staff corps of the Navy*[;] . . . who has since that appointment served continuously on the active list of the Navy, is computed from June 30 of the fiscal year in which he accepted that appointment.

10 U.S.C. § 6388(b) (1976) (emphasis added).

In 1972, however, in response to an inquiry by the Navy Personnel Command ("NPC"), the Judge Advocate General ("JAG") of the Navy determined that 10 U.S.C. § 6388(b) did not apply to officers who entered the Navy through an officer recruitment program called the JAGC Student Program,[2] because these officers were not "initially appointed" in a staff corps.  AR at

---

[1] The facts cited herein were derived from the July 23, 2007 Administrative Record ("AR").

[2] The JAGC Student Program allowed prospective law students to serve in the United States Navy Reserve on inactive duty status, with the rank of Ensign, while the student obtained a law degree.  AR at 1419-20.  Participants attended law school at their own expense and did not receive military pay or allowances, unless they were called to active duty.  *Id.*  A JAGC Student Program participant, however, accrued "longevity credit" that would result in a higher pay when the JAGC Student Program participant was placed on active duty.   *Id.*   After law school

1374-79.  The JAG interpreted 10 U.S.C. § 6388(b) as limited only to those officers whose first or "initial" appointment was as a regular staff officer, not as a reserve line officer.  AR at 1375.

In addition, the JAG concluded that 10 U.S.C. § 6388(c)[3] also did not apply to JAGC officers who entered the Navy through the JAGC Student Program.  AR at 1376-77.  Section 6388(c) allowed staff officers who did not meet the requirements of 10 U.S.C. § 6388(b) to be credited, for purposes of involuntary retirement, with the same total commissioned service as the officer immediately junior (in terms of eligibility for promotion) in the same staff corps who met all the requirements of 10 U.S.C. § 6388(b).  10 U.S.C. § 6388(c).  The JAG determined that this "matching" provision did not apply to most JAGC officers, because very few JAGC officers met all the requirements of 10 U.S.C. § 6388(b).  AR at 1375-76.  As a consequence of the JAG's interpretation of 10 U.S.C. § 6388(b)-(c), the JAG concluded that there was no lawful mechanism to compute the total commissioned service of JAGC officers who entered the Navy through the JAGC Student Program.  AR at 1378-79.

## B.      Regarding Navy Retirement After September 15, 1981.

On December 12, 1980, the Defense Officer Personnel Management Act (hereinafter "DOPMA"), was enacted "to revise and standardize the provisions of law relating to appointment, promotion, separation, and mandatory retirement of regular commissioned officers of the Army, Navy, Air Force, and Marine Corps."  Pub. L. No. 96-513, 94 Stat. 2835 (1980).  DOPMA became effective on September 15, 1981.  *Id.* at § 704.

DOPMA defined a new benchmark for computing an officer's mandatory retirement date, based on "active commissioned service" as day-to-day service on full-time active duty as a commissioned officer.[4]  Prior to DOPMA, the concept of "active commissioned service" did not exist and the method for computing an officer's involuntary retirement date varied among the services.  *Compare* 10 U.S.C. § 3927 (1976) (Army), *with* 10 U.S.C. §§ 6387-88 (1976) (Navy) *and* 10 U.S.C. § 8927 (1976) (Air Force) (1976) (all repealed 1981).  As previously discussed, in the Navy, the pre-DOPMA metric for determining an officer's mandatory retirement date was years of "total commissioned service."  10 U.S.C. §§ 6371-86 (1976) (repealed 1981).  The

---

graduation and admission to a state bar, a JAGC Student Program participant was ordered to active duty and to attend the Naval Justice School ("NJS").  *Id.*  After successful completion of the NJS, a JAGC Student Program participant received a superseding appointment as a JAGC Reserve Line Officer and was obligated to serve on active duty for a minimum of four years.  *Id.*

[3] There are six subsections to 10 U.S.C. 6388, (a) through (f), but subsections (a) and (d)-(f) specifically apply to other staff corps, so only subsections (b) or (c) apply to JAGC Officers.

[4] 10 U.S.C. § 101(d)(1) ("'[A]ctive duty' means full-time duty in the active military service of the United States"); 10 U.S.C. § 101(d)(3) ("'[A]ctive service' means service on active duty"); 10 U.S.C § 101(b) ("(1) The term "officer" means a commissioned or warrant officer. (2) The term "commissioned officer" includes a commissioned warrant officer.").

calculation of an officer's total commissioned service also could vary depending on the type of an officer's appointment, their gender, and whether he/she was a staff or line officer.[5]

To reconcile the pre-DOPMA and post-DOPMA methods of determining mandatory retirement, DOPMA included "Transition Provisions." Pub. L. No. 96-513, Title IV §§ 600-42 (1980). One of these Transition Provisions established a new procedure for computing years of "active commissioned service" for officers with both pre-DOPMA and post-DOPMA service. DOPMA § 624. Under subsection (a) of this statute, years of "active commissioned service," for purposes of involuntary retirement, was calculated by adding:

> (1) the amount of service creditable[6] to such officer on the day before the effective date of this Act [Sept. 15, 1981] for the purpose of determining whether the officer is subject to involuntary retirement or discharge; and

> (2) all subsequent active commissioned service of such officer.

DOPMA § 624(a).

DOPMA § 624(b) also provided that, if under pre-DOPMA law there was no method to compute an officer's "total commissioned service," the Secretaries of each military department were authorized to promulgate regulations to compute service dates within their respective departments:

> In the case of an officer subject to placement on the active-duty list on September 15, 1981 *for whom no means of computing service creditable in determining whether the officer is subject to involuntary retirement or discharge existed under the law in effect on the day before the effective date of this Act* [Sept. 15, 1981], the amount of creditable service of such officer for such purpose for the period before the effective date of this Act [Sept. 15, 1981] shall be determined under regulations prescribed by the Secretary of the military department concerned, except that such an officer may not be credited with an amount of service less than the amount of his active commissioned service.

DOPMA § 624(b) (emphasis added).

---

[5] Generally, Navy officers are either line officers or staff officers. Officers "with a ship of the line," who command and lead operational naval vessels and units are known as line officers. In contrast, staff officers have specific professional education or specialized skills, *e.g.*, doctors, nurses, clergy, civil engineers, logisticians, and attorneys, who comprise professional "staff corps," such as the Medical Corps, the Chaplain Corps, the Civil Engineering Corps, the Supply Corps, and the Judge Advocate General Corps. 10 U.S.C. § 5150 (2006); *see also* Manual of Navy Officer Manpower and Personnel Classifications, ("NAVPERSCOM") 158391, Vol. I, at A-2 (Sept. 25, 2009).

[6] Prior to DOPMA, in the Navy, "service creditable" was synonymous with "total commissioned service" for purposes of determining involuntary retirement. 10 U.S.C. § 6377 (1976) (repealed 1981).

For the reasons previously discussed, prior to DOMPA's enactment, "total commissioned service" was computed for JAGC officers, pursuant to 10 U.S.C. § 6388(b) or (c). After DOPMA was enacted, however, the Secretary of the Navy ("Secretary"), relying on the JAG interpretation of 10 U.S.C. § 6388(b)-(c), found that there was no "means" to calculate the pre-DOPMA "total commissioned service" of certain staff corps officers. AR at 1273. Therefore, acting pursuant to DOMPA § 624(b), the Secretary issued Instruction 1821.1 to govern how the pre-DOPMA "total commissioned service" for such officers would be calculated. SECNAVINST 1821.1 at ¶ 1 (Jan. 29, 1982) (AR at 1273).

SECNAVINST 1821.1 created a "matching" system, similar to that described in 10 U.S.C. § 6388(c) (repealed 1981), but allowed JAGC officers to be matched with line officers (*i.e.*, not just limited to officers within the same staff corps). *Id.* at ¶ 6 (AR at 1274-75). Under SECNAVINST 1821.1, once a "match officer" was identified, a JAGC officer was assigned the same "service date" as the match officer. *Id.* This "service date" was the base year from which "total commissioned service" commenced, ultimately determining a JAGC officer's involuntary retirement date. *Id.* at ¶ 5.h (AR at 1274). Next, this service date was adjusted in whole year increments to a later service date for each year of "constructive service credit" granted to a staff officer at the time that officer was appointed to a staff corps for having obtained advanced education. *Id.* at ¶ 6 (AR at 1275). Constructive service credit was "utilized in determining a Staff Corps Officer's initial grade and date of rank." AR at 1273. It is granted for satisfactorily completed advanced education, training, or experience beyond the baccalaureate degree level awarded to a Staff Corps Officer[.]" *Id.*; *see also* 10 U.S.C. § 5600 (repealed 1996).[7] SECNAVINST 1821.1, however, also incorporated constructive service credit into the service date calculation for affected officers. AR at 1275.

In addition, SECNAVINST 1821.1 delegated to the Commander of the Naval Personnel Command ("NPC") responsibility for computing the service date for all affected officers and notifying each of their service dates. *Id.* at ¶ 8 (AR at 1276). Pursuant to this delegation, the NPC Commander issued NAVMILPERSCOM Notice 1821 (Dec 13, 1982) ("Notice 1821"). AR at 1278. Notice 1821 listed six methods to compute service dates in accordance with SECNAVINST 1821.1. Notice 1821.1 ¶ 6.h; *see also* AR at 1280. Notice 1821 also included a list of all officers who had their service dates recalculated, pursuant to the six methods listed therein. AR at 1979-2032. This list included the officer's name, social security number, a letter designation of the method of recalculation used, the base service date assigned (or "matched"), the years (if any) of constructive service credit given, and the final assigned service date. AR at 1279-80, 1977-78.

## II.    RELEVANT FACTS.

On July 8, 1971, Plaintiff entered the JAGC Student Program and accepted a permanent appointment as a line officer in the Navy Reserve, with the rank of Ensign on inactive duty. AR at 1160; *see also* AR at 115, 1167-68. Plaintiff enrolled as a full-time law student and was

---

[7] This statute authorizes officers to receive service credit upon an original appointment for years of professional education and experience. 10 U.S.C. § 5600 (repealed 1996).

placed on inactive duty status until he passed the California Bar Exam in the fall of 1974.[8]  AR at 115.

On December 27, 1974, Plaintiff began active duty in the Navy JAGC.[9]  AR at 1153-54. On April 14, 1975, Plaintiff accepted a permanent appointment in the Navy Reserve JAGC, with the rank of a Lieutenant (junior grade) ("LTJG").  AR at 1163.  On June 26, 1975, Plaintiff received a temporary appointment[10] to the next higher grade in the Navy Reserve JAGC as a Lieutenant ("LT").  AR at 1162.  Although these were Reserve appointments, the Administrative Record evidences that Plaintiff was on active duty at all times from December 27, 1974 until July 1, 2002.  AR at 1159.

On September 20, 1977, Plaintiff transferred from the Navy Reserve to the Regular Navy, after completing his initial active duty service obligation in the JAGC Student Program.  AR at 1156, 1159.  To effect this transfer, Plaintiff was separated from the Navy Reserve and immediately appointed as a LTJG in the Regular Navy, backdated to December 2, 1972.[11]  AR at 1156, 1159.  On that date, Plaintiff also received a temporary appointment as a LT in the Regular Navy, backdated date to June 1, 1975.[12]  AR at 1156, 1159.  Plaintiff remained on active duty in the Navy JAGC for the next 15 years, achieving the rank of Captain.  AR at 1152.

A Navy Captain is required to retire after completing 30 years of "active commissioned service," unless he/she is promoted to Rear Admiral or otherwise earlier retired.  10 U.S.C. § 634(a) (2006) (stating, in relevant part, that officers in the Regular Navy with the grade of Captain who have not been selected for promotion, "*shall*, if not earlier retired, be retired on the

---

[8] The Administrative Record, however, evidences that Plaintiff was placed on active duty for a short period of time to attend an officer training course in the summer of 1973, between his second and third year of law school.  AR at 1153, 1420.

[9] Plaintiff's active duty base date is listed as November 2, 1974, but his actual service date appears to have been December 27, 1974.  AR at 1153-54.  The Administrative Record also does not explain this inconsistency.

[10] In 1975, officers with a rank below Lieutenant could be appointed temporarily to the next higher rank, if the number of officers on active duty in that rank exceeded the numeric statutory limit for officers of that particular rank.  10 U.S.C. § 5596 (1970).  This administrative adjustment allowed lower ranking officers to be promoted, pursuant to a typical career progression, but also remain in compliance with the statutory caps on the number of officers that Congress authorized for active duty at any given time.  *Id.*

[11] Although the Administrative Record does not explain why Plaintiff's dates of rank were backdated, likely this reflects service credit granted to Plaintiff to maintain his promotion status with Regular Navy peers for purposes of promotion eligibility.  10 U.S.C. § 5578a(b) (repealed 1981) (governing the appointment Officers to the Regular JAGC from the Navy Reserve).  *See* AR at 1156 (referencing 10 U.S.C. § 5578a).

[12] *Supra* note 10.

first day of the month after the month in which he [or she] completes *30 years of active commissioned service*.") (emphasis added);[13] *see also* AR at 123.

On December 21, 2000, the NPC notified Plaintiff that he would be retired on July 1, 2002, upon "completion of 30 years commissioned service," pursuant to 10 U.S.C. § 634. Plaintiff entered the Navy on July 8, 1971, a decade prior to DOPMA's effective date. Pub. L. No. 96-513 §§ 701. Accordingly, Plaintiff was among the officers who had their service dates calculated under Notice 1821. Notice 1821 promulgated six methods for computing service dates. AR at 1977-78. Plaintiff's service date was calculated by the "Matched" or "M" method:

> (4) Matched (M) – The rank, date of rank, and precedence number of the staff corps officers at the time of augmentation into the regular Navy is computed to the first regular Navy officer who is junior on the matching officer list. The service date of the matching officer is assigned the base year from which the staff corps officer's date is determined by *adding* constructive credit.

AR at 1280 (emphasis added).

Under the "M" method, Plaintiff was matched with a line officer with a base service date of 1971. Notice 1821 at encl. 4, p. 5 (AR at 2022-23) (matching Plaintiff with a Lieutenant Commander Yeatman). Next, Plaintiff's service date was adjusted one year later for constructive service credit to 1972. *Id.* Because Plaintiff reached the grade of Captain, Plaintiff's involuntary retirement date was computed by adding 30 years to the July 1, 1972 service date, resulting in an involuntary retirement date of July 1, 2002. AR at 123 (citing 10 U.S.C. § 634).

On June 30, 2002, Plaintiff involuntarily was retired from the Navy for completing 30 years of active commissioned service. AR at 1166. Plaintiff's retirement *pay*, however, is based on his years of *active service*[14] not "total commissioned service" nor "active commissioned service."[15] The three years Plaintiff spent on inactive duty in the JAGC Student Program was not included in his retirement pay calculation. AR 124-134; *see also* 10 U.S.C. § 1405 (computing years of service for retirement pay purposes by adding a service member's "years of active service" and other types of service not applicable in this case). As result, Plaintiff's retirement pay reflects only his 27 years and 7 months of active duty, not his 30 years of active commissioned service. AR at 1166; *see also* Gov't Mot at 16-17; Gov't St. of Facts ¶ 11.

---

[13] There are also limited exceptions to this general rule. *See e.g.*, 10 U.S.C. § 634(b) (excepting officers who are professors at the United States Naval Academy from mandatory retirement); *see also* 10 U.S.C. § 637(b)(1) (allowing officers to be retained on active duty "subject to the needs of the service," as determined the Secretary of the relevant armed service).

[14] *Supra* note 4.

[15] *See* 10 U.S.C. §§ 1401, 1405-06, 1409 (computing monthly military retirement pay for a service member by multiplying a service member's base monthly salary at the grade which retired by 2 1/2 percent of the service member's years of active service) (for an officer who serves for 30 years on active duty this generally results in monthly retirement pay of 75 percent of the member's active duty base monthly salary.).

### III.    PROCEDURAL HISTORY.

#### A.    Before The Naval Personnel Command.

On June 6, 2001, Plaintiff petitioned the NPC to recalculate his assigned mandatory retirement date.  AR at 124-34.  The petition analyzed the legislative and regulatory history of "total commissioned service" pre-DOPMA and post-DOPMA and concluded that Plaintiff's retirement date "could not arise before 1 July 2005."  AR at 134.  The Administrative Record does not evidence that Plaintiff received any response from the NPC.  AR at 140-44.  Instead, the NPC forwarded Plaintiff's June 6, 2001 petition to the Office of the Judge Advocate General ("OJAG") for an opinion.  AR at 140-44.

On June 7, 2002, the NPC staff advised Plaintiff by e-mail that the OJAG determined that the NPC's method for calculating Plaintiff's retirement date was "legally permissible."  AR at 141.  The Administrative Record, however, does not evidence that Plaintiff was provided with a copy of the OJAG opinion on which the NPC relied in denying Plaintiff's June 6, 2001 petition. AR at 141.  Plaintiff was informed, however, that the NPC did not respond to Plaintiff's June 6, 2001 letter, because the NPC believed OJAG responded directly to Plaintiff.  *Id.*

Shortly before Plaintiff was retired on July 1, 2002, Plaintiff requested that the Chief of Naval Personnel ("CNP") respond to Plaintiff's unanswered June 6, 2001 petition.  AR at 145-46; *see also* Compl. ¶ 19.  On August 27, 2002, an Assistant Legal Counsel to the CNP sent Plaintiff a letter attempting to respond to Plaintiff's inquiries, but admitted that certain records relevant to Plaintiff's petition may have been lost in a recent move.  AR at 147-48 ("There are no individual records of the decision in your case.").

#### B.    Before The Board For Correction Of Naval Records.

On December 18, 2003, Plaintiff filed a timely Application for Correction of Military Record ("Application for Correction") with the Board for Correction of Naval Records ("BCNR") to "correct the calculated date for [Plaintiff's] involuntary retirement."  AR at 113-49.

On April 20, 2004, Plaintiff sent an e-mail to the BCNR to inquire about the status of his December 18, 2003 Application and notify the BCNR that, if the NPC issued an Advisory Opinion in his case, Plaintiff intended to file a comment, pursuant to 10 U.S.C. § 1556 (2006) (requiring the BCNR to provide applicants with copies all correspondence that "pertain directly to the applicant's case or have a material effect on the applicant's case") and the BCNR Organizational and Procedure Manual ("BCNR Manual").  AR at 55; *see also* BCNR Instruction 5400.1A, at 7-3, ¶ 704 (Feb. 28, 2002) (AR at 1542).  In addition, Plaintiff requested guidance about the proper procedure for supplementing his December 18, 2003 Application for Correction.  AR at 55.  On that same date**,** Plaintiff received an e-mail from the BCNR staff indicating that the BCNR was waiting for an Advisory Opinion from the NPC.  *Id.*

On May 2, 2004, Plaintiff supplemented the December 18, 2003 Application for Correction ("Supplement").  AR at 151, 192 n. 2.[16]  On May 5, 2004, the BCNR received an Advisory Opinion from the NPC, recommending that Plaintiff's December 18, 2003 Application for Correction be denied.  AR at 107, 247-52.  On May 11, 2004, the BCNR, relying on the NPC Advisory Opinion, denied Plaintiff's December 18, 2003 Application for Correction.  AR at 106.

Thereafter, Plaintiff and the BCNR staff had numerous communications regarding ancillary Freedom of Information Act and Privacy Act requests that Plaintiff made for documents relating to the BCNR's May 11, 2004 decision.  AR at 1-1149.

On July 29, 2005, the BCNR Executive Director concluded that Plaintiff's April 26, 2005 and June 30, 2005 letters were requests for reconsideration and therefore were denied, because no new "material" information was proffered that was "likely to have a substantial effect on the outcome" of the BCNR's May 11, 2004 decision.  AR at 28 (citing 32 C.F.R. § 723.9).[17]  In addition, Plaintiff was advised that he had "exhausted the administrative remedies available to [him] at the BCNR and [Plaintiff was] free to pursue the matter in a court of competent jurisdiction."  AR at 30.

## C.    Before The United States Court Of Federal Claims.

On December 6, 2006, Plaintiff filed a *pro se* Complaint in the United States Court of Federal Claims, seeking correction of his military records, "including a determination that the date of his mandatory retirement is July 1, 2008, and for adjustments to pay and allowances for the intervening period and for related relief."  Compl. ¶ 1.  On February 5, 2007, Plaintiff filed a *pro se* Amended Complaint ("Am. Compl."), specifically seeking corrective and monetary relief under the Tucker Act, 28 U.S.C. § 1491(a)(1); the Military Pay Act, 37 U.S.C. § 204; 10 U.S.C.

---

[16] The Administrative Record contains no evidence that the BCNR substantively reviewed the Supplement to Plaintiff's December 18, 2003 Application for Correction.

[17] This regulation governs reconsideration by military correction boards and states that:

Further consideration will be granted only upon presentation by the applicant of new and material evidence or other matter not previously considered by the Board. New evidence is defined as evidence not previously considered by the Board and not reasonably available to the applicant at the time of the previous application.  Evidence is material if it is likely to have a substantial effect on the outcome.  All requests for further consideration will be initially screened by the Executive Director of the Board to determine whether new and material evidence or other matter (including, but not limited to, any factual allegations or arguments why the relief should be granted) has been submitted by the applicant.  If such evidence or other matter has been submitted, the request shall be forwarded to the Board for a decision.  If no such evidence or other matter has been submitted, the applicant will be informed that his/her request was not considered by the Board because it did not contain new and material evidence or other matter.

32 C.F.R. § 723.9.

§ 1552 (authorizing the correction of military records); and 10 U.S.C. §§ 1401-12 (computation of military retired pay).  Am. Compl. ¶ 4.

On March 28, 2007, the Government filed a Motion to Stay to allow the Navy to request reconsideration of Plaintiff's December 18, 2003 Application for Correction, based on "changed circumstances," *i.e.*, "[u]pon review of the BCNR record, it appears that the [B]oard did not consider certain documents submitted by [Plaintiff]."  On April 16, 2007, Plaintiff filed a Response in Opposition.  On April 30, 2007, the Government filed a Reply.  On May 8, 2007, the court convened a status conference, wherein the Government withdrew the March 28, 2007 Motion to Stay.

On June 28, 2007, however, the court issued a Memorandum Opinion and Order directing *pro se* Plaintiff to file an Application for Default Judgment pursuant to RCFC 55(b)(2),[18] because the Government's counsel failed to file an Answer or respond to Plaintiff's February 5, 2007 Amended Complaint in accordance with RCFC 12.  *Prochazka* v. *United States,* 77 Fed. Cl. 172 (2007).  On July 12, 2007, Plaintiff filed a Motion For Default Judgment.  On July 13, 2007, the Government filed a Motion for Reconsideration of the court's June 28, 2007 Memorandum Opinion and Order.  On July 16, 2007, the court convened a status conference wherein the court deferred ruling on the Government's Motion For Reconsideration and Plaintiff's Motion for Default Judgment.  7/6/07 TR at 14:6-9.

On July 23, 2007, the Government filed the Administrative Record.  AR at 1-1462.  On August 3, 2007, the Government filed a Motion To Dismiss, pursuant to Rule 12(b)(6) or, in the alternative, a Motion For Summary Judgment On The Administrative Record ("Gov't Mot").  On October 18, 2007, Plaintiff filed a Response and Cross-Motion For Judgment On The Administrative Record ("Pl. Resp. & Cr. Mot.").  On November 26, 2007, the Government filed a Reply to Plaintiff's Cross-Motion and Response ("Gov't Reply & Resp.").  On December 20, 2007, Plaintiff filed a Reply ("Pl. Reply").

On March 25, 2008, the court stayed this case to allow *pro se* Plaintiff time to obtain counsel.

On August 6, 2008, the National Veteran's Legal Services Program filed a brief as *amicus curiae* on behalf of Plaintiff.  On September 17, 2008, with leave of the court, both parties filed Responses to the Amicus Curiae.

On January 26, 2009, Thomas A. Coulter of LeClair Ryan, PC filed a motion to appear as counsel for *pro se* Plaintiff.  On that date, the court entered a Scheduling Order to afford Plaintiff's counsel the opportunity to file a Supplemental Brief by April 13, 2009 ("Pl. Supp. Br.").  On May 18, 2009, the Government filed a Response ("Gov't Supp. Br. Resp.").  On June 22, 2009, Plaintiff filed a Reply ("Pl. Supp. Br. Reply").

---

[18] RCFC 55(b)(2) provides that "[t]he party must apply to the court for a default judgment.  A default judgment may be entered only if the claimant establishes a claim or right to relief by evidence that satisfies the court."  RCFC 55(b)(2).

On September 16, 2009, the court heard oral argument on the Government's Motion To Dismiss and the parties' respective Motions For Judgment On The Administrative Record. 9/16/09 TR at 1-114.

## IV.   DISCUSSION.

### A.   Jurisdiction.

The Tucker Act provides that the United States Court of Federal Claims has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  The Tucker Act, however, does not, by itself, confer jurisdiction on the court.  *United States* v. *Testan*, 424 U.S. 392, 398 (1976) ("The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.  The Court of Claims has recognized that the Act merely confers jurisdiction upon it whenever the substantive right exists.").  Therefore, a plaintiff must identify an independent basis by way of a contract, federal statute, regulation, or the Constitution upon which it is entitled to monetary payment from the federal government.  *United States* v. *Mitchell*, 463 U.S. 206, 216-17 (1983) ("The claim must be one for money damages against the United States and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.") (internal citations omitted); *Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) ("in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be money-mandating.") (internal citations and quotations omitted).

The February 5, 2007 Amended Complaint invokes the jurisdiction of the United States Court of Federal Claims, under the Tucker Act and the Military Pay Act.  Am. Compl. ¶ 4.  The February 5, 2007 Amended Complaint also seeks a correction of Plaintiff's military records under 10 U.S.C. § 1552.  The United States Court of Appeals for the Federal Circuit, however, has held in *Martinez* v. *United States*, 333 F.3d 1295 (Fed. Cir. 2003) (*en banc*) that any monetary damages claims under this statute originates only from the Military Pay Act, because 10 U.S.C. § 1552:

> is "money-mandating" in the sense that it requires that the government grant monetary relief to a service member if the correction board determines that the service member's record should be corrected in a way that entitles the service member to back pay.  *But section 1552 is not the source of the right to back pay*; that right comes from a different statute, such as the Military Pay Act, 37 U.S.C. § 204.  Accordingly, even though section 1552 mandates the payment of money if the correction board concludes that the service member's discharge was unlawful,

section 1552 is not the "money-mandating" statute that gives rise to the cause of action that provides the basis for a Tucker Act suit in the Court of Federal Claims.

*Id.* at 1315 (emphasis added).[19]

The United States Court of Federal Claims, however, also may order the correction of military records from which money damages are required under the Military Pay Act. *Voge* v. *United States*, 844 F.2d 776, 781 (Fed. Cir. 1988) ("Section 1491(a) gives the Claims Court power to order the correction of military records only 'incident of and collateral to' its award of a money judgment.") (quoting *Silbert* v. *United States*, 215 Ct. Cl. 1311 (Ct. Cl. 1977)); *see also Heisig* v. *United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (recognizing "judicial review of military service determinations with money consequences"). Therefore, if Plaintiff improperly was separated from the Navy, requiring award of money damages, Plaintiff's military record *ipso facto* would be corrected.

Since the February 5, 2007 Amended Complaint invokes the Military Pay Act, seeking accrued pay and benefits as a result of Plaintiff's premature and therefore unlawful discharge, the court has determined that it has jurisdiction to adjudicate those claims. *Martinez*, 333 F.3d at 1303 ("In order to bring a military discharge case in the Court of Federal Claims, a plaintiff therefore must allege that, because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge."); *see also Holley* v. *United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) ("It is well established that [the Military Pay Act] serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge . . . If the discharge was wrongful the statutory right to pay continues; this right serves as the basis for Tucker Act jurisdiction.").

## B.    Standard Of Review On Motion To Dismiss, Pursuant To RCFC 12(b)(6).

To survive a motion to dismiss for failure to state a claim upon which relief may be granted, a complaint must "state a claim to relief that is plausible on its face," *i.e.*, sufficient factual content must be pled on which a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 556 (2007)). The plausibility standard "asks for more than a sheer possibility that the defendant acted unlawfully." *Id.* "Plausibility of 'entitlement to relief'" requires more than pleading facts that are "merely consistent with" a defendant's liability. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In *Iqbal*, the United States Supreme Court discussed the "two working principles" of *Twombly's* heightened pleading requirements. *Id.* First, although factual allegations alleged must be accepted true, the trial court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citing *Twombly*, 550 U.S. at 555). Accordingly, the Court advised trial courts to begin their analysis "by identifying allegations [of law] in the complaint that are not entitled to the assumption of truth." *Id.* at 1949-50. If the legal allegations are "conclusory

---

[19] The reasoning in *Martinez* equally applies to 10 U.S.C. §§ 1401-12, that is also cited as a basis for the court jurisdiction. Am. Compl. ¶ 4.

in nature," they are not entitled to the presumption of truth.  *Id*. at 1950.  Second, to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint also must state a "plausible claim for relief."  *Id*. at 1950 (citing *Twombly*, 550 U.S. at 556).  Here, factual allegations are examined to determine "if they plausibly suggest an entitlement to relief."  *Id*. at 1951.

For the reasons discussed herein, the court has determined that the February 5, 2007 Amended Complaint properly states a claim for monetary relief within the jurisdiction of the court that is "plausible" in the detail of the pleading and in the potential entitlement to monetary relief.  Am. Compl.; *see also Iqbal*, 129 S. Ct. at 1950-51.

### C.  Standard Of Review For Motion For Judgment On The Administrative Record, Pursuant To RCFC 52.1.

A motion for judgment on the administrative record, pursuant to RCFC 52.1, has no counterpart in the Federal Rules of Civil Procedure.  RCFC 52.1, Rules Committee Note (July 13, 2009).  Therefore, summary judgment standards are not applicable under RCFC 52.1.  *Id*. (adopting the holding in *Bannum, Inc*. v. *United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record.")); *see also A & D Fire Prot*. v. *United States*, 72 Fed. Cl. 126, 131 (2006) ("The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record.").  Accordingly, on a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met the burden of proof to show that the agency's decision was not in accordance with the law.  *Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 52.1 from the [limited] record evidence as if it were conducting a trial on the record."); *see also Afghan American Army Services Corp*. v. *United States*, 2009 WL 3768441, *9 (Fed. Cl. 2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.").  The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record; nor is the court required to conduct an evidentiary proceeding.  *Id*.

### D.  The Parties' Arguments.

Plaintiff and *amicus curiae* have raised significant statutory and constitutional issues that have consequences beyond this case.  The court, however, has determined that these issues are not ripe for adjudication, because the BCNR has not had the opportunity to consider whether Plaintiff's service date and constructive service credit were properly calculated, based on a complete record conforming to applicable procedures, or to consider Plaintiff's argument that the Navy used the wrong method to compute his service date under Notice 1821.  *McCarthy* v. *Madigan*, 503 U.S. 140, 145 (1992) (explaining that the exhaustion doctrine is "grounded in deference to Congress's delegation of authority to coordinate branches, *that agencies*, not the courts, ought to *have primary responsibility for the programs that Congress has charged them to administer*" and emphasizing that the exhaustion doctrine applies with special force when Congress authorized "the agency to apply its special expertise," as the doctrine "acknowledges the commonsense notion of dispute resolution that an agency ought to

have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.") (superceded by statute on other grounds, 42 U.S.C. § 1997e(a) (emphasis added)).

Accordingly, the summary of the parties arguments that follows discusses *only* those arguments related to the BCNR's review and May 11, 2004 denial of Plaintiff's December 18, 2003 Application for Correction.

### 1.     The Government's August 3, 2007 Motion To Dismiss Or In The Alternative, Motion For Summary Judgment On The Administrative Record.

The Government argues entitlement to judgment on the Administrative Record, because the May 11, 2004 decision of the BCNR was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence. Gov't Mot. at 18. Judicial review of a final decision of a military correction board is limited to determining whether there has been substantial compliance with statutes and regulations, whether the board acted arbitrarily or capriciously, and whether there is substantial evidence to support the board's decision. *Id*. The Government emphasizes that "judicial deference must be at its apogee in matters pertaining to the military and national defense." *Id.* (quoting *Voge* v. *United States*, 844 F.2d 776, 779 (Fed. Cir. 1988)). A plaintiff seeking correction of his/her military record must demonstrate entitlement to relief by "cogent and clearly convincing evidence." *Id*. (quoting *Wronke* v. *Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1983)). In this case, the BCNR interpreted the law in the same manner as the Navy and found that Plaintiff was not entitled to any more money than he has received. *Id*. Therefore, the BCNR's decision to deny correction was neither arbitrary nor capricious but simply followed the law. *Id.*

### 2.     Plaintiff's October 18, 2007 Response And Cross-Motion For Judgment On The Administrative Record.

Plaintiff responds that the BCNR never considered Plaintiff's claim that the NPC erred in calculating his mandatory retirement date. Pl. Resp. & Cr. Mot. at 15. Specifically, Plaintiff argues that the CNP's Assistant Legal Counsel's August 27, 2002 letter concedes that the Navy erred in calculating Plaintiff's service date for two reasons. *Id*. (citing AR at 147-49). First, the CNP Assistant Legal Counsel could not account for why Plaintiff received only one year of constructive service credit for his law school education, instead of three. AR at 148-49. Second, the CNP Assistant Legal Counsel admitted: "[t]here are no individual records of the decision [computing Plaintiff's service date] in your case" and, therefore, "I cannot reconcile the two versions of your entry into the Navy." *Id.*

Since the BCNR was obligated to identify and address all of Plaintiff's claims of "constitutional, statutory, and/or regulatory violations" when it denied the December 18, 2003 Application for Correction, the BCNR erred in that it did not fully explain the basis for the May 11, 2004 denial decision. *Id.* at 16. Instead, the BCNR's May 11, 2004 denial decision is only a standardized form letter that does not identify or address any issues raised in Plaintiff's

December 18, 2003 Application.  *Id.* Accordingly, the BCNR's May 11, 2004 decision *ipso facto* was arbitrary, capricious, contrary to law or unsupported by substantial evidence.  *Id.*

Likewise, the BCNR Executive Director also failed to articulate the basis for his July 29, 2005 denial, despite the fact that Plaintiff made it abundantly clear that he was not seeking reconsideration, but instead was requesting documents that the BCNR reviewed in rendering the May 11, 2004 denial decision.  *Id.*

3.       **The Government's November 26, 2007 Reply And Response To Plaintiff's Cross-Motion For Judgment.**

The Government replies that Plaintiff's service date was not computed erroneously and the Navy never admitted to making such a mistake.  Gov't Reply & Resp. at 10.  Plaintiff entered the Navy on July 8, 1971 and his mandatory retirement date was computed simply by adding 30 years to the fiscal year of this appointment, *i.e.*, 1972.  *Id.*  This computation resulted in a mandatory retirement date of June 30, 2002.  *Id.*  Plaintiff was ordered retired the next day on July 1, 2002.  *Id.*  The Navy followed the law and made no arithmetic errors.  *Id.* at 10-11.

Moreover, Plaintiff's complaints about his treatment before the BCNR do not independently form a basis for monetary relief in the United States Court of Federal Claims.  *Id.* at 11.  The statute empowering military correction boards to correct military records, 10 U.S.C. § 1552, is not "money mandating" and the fact that the BCNR did not address all of Plaintiff's arguments to the level of detail satisfactory to Plaintiff does not entitle him to monetary relief. *Id.* at 12.  Likewise, the allegation that the BCNR Executive Director may have construed Plaintiff's *pro se* request for records as a motion for reconsideration does not entitle Plaintiff to monetary relief.  *Id.*  In sum, Plaintiff's allegations concern BCNR procedural errors and do not support an award of money damages, and therefore, they exceed the court's Tucker Act jurisdiction.  *Id.*

4.       **Plaintiff's December 20, 2007 Reply.**

Plaintiff replies that the Government fundamentally misunderstands how Plaintiff's service date was calculated.  Pl. Reply at 19.  Plaintiff's service date was not calculated by simply adding 30 years to the date he was first commissioned in the inactive Reserve.  *Id.* Instead, Plaintiff was matched with a line officer in accordance with SECNAVINST 1821.1 and NAVMILPERSCOM Notice 1821.  *Id.* (citing AR at 1271, 1274).  Plaintiff's service date was then adjusted in whole year increments to a later service date for each year of constructive service credit.  *Id.*  The Navy erred in making this calculation, because Plaintiff's service date was adjusted for only one year of constructive service credit when he was entitled to three years of adjustment, pursuant to 10 U.S.C. § 5600.[20]  *Id.*  In addition, because the enumerated BCNR errors were so numerous, correction of Plaintiff's military service record is required.

_____

[20] *Supra* note 7.

**5.      Plaintiff's April 13, 2009 Supplemental Brief.**

Plaintiff's Supplemental Brief raised a new, but perhaps determinative argument, that the Navy used the wrong method to calculate his involuntary retirement date under the terms of NAVMILPERSCOM Notice 1821.  Pl. Supp. Br. at 36-38.  Plaintiff contends that his service date should have been computed under the first method listed in Notice 1821, the "Accepted Appointment" or "AA" method, not the "Matched" or "M" method.  *Id*. at 36-38.  Notice 1821 described the AA method as follows:

> For a staff corps officer who accepted an *original permanent appointment as an ensign or lieutenant (junior grade) in the regular Navy* and has served continuously on the active list of the Navy since the date of acceptance of appointment, the service date is the fiscal year of appointment.  Section 6388 of reference (c) [Title 10 U.S.C], as in effect on 14 September 1981 applies.  For staff corps officer who accepted an original appointment as a lieutenant or above in the regular Navy, the service date is computed by matching, method M or MIC (see below).

Notice 1821 ¶ 5.h.(1) (AR at 1280) (emphasis added).

The term "original" has a specific statutory definition in the context of officer appointments in the armed forces.  10 U.S.C. § 101(b)(10) ("The term 'original', with respect to the appointment of a member of the armed forces in a regular or reserve component, refers to that member's *most recent appointment in that component that is neither a promotion nor a demotion*." (emphasis added)).  Therefore, under the Navy's own regulations, Plaintiff's service date should have been determined by the AA method.  Pl. Supp. Br. at 37.  On September 20, 1977, Plaintiff accepted an *original permanent appointment* as a LTJG in the Regular Navy.  *Id*.  This was Plaintiff's most recent appointment in the Regular Navy that was neither a promotion nor a demotion.  *Id*.  Plaintiff served continuously on the active list of the Navy after that appointment.  *Id*.  Therefore, Plaintiff's service date should be the fiscal year of this appointment, *i.e.*, 1978.  *Id*.  The AA method uses the term "original appointment" not "initial" or "first," and the Navy has never contested the fact that the year of Plaintiff's "original" appointment in the Regular Navy was 1978.  *Id*.  Moreover, this method makes clear that the pertinent appointment is the original appointment "*in the Regular Navy*."  Therefore, Plaintiff's appointment in the inactive reserve is irrelevant for purposes of calculating Plaintiff's service date under the AA method.  *Id*.

The NPC Advisory Opinion, on which the BCNR relied, however, refers only to "original" appointments and does not mention "initial" appointments.  *Id*. at 39.  Moreover, the NPC Advisory Opinion states that total commissioned service could be calculated from June 30th of the fiscal year "in which the officer: (1) accepted an *original* regular appointment; (2) in the JAGC; (3) as an ensign or lieutenant (junior grade); and (4) served continuously on active duty thereafter."  *Id.* at 36 (citing AR at 107-08) (emphasis in the original).  But, Plaintiff met all these requisites as described in the NPC Advisory Opinion.  Therefore, Plaintiff's total commissioned service should be calculated from June 30, 1978, the fiscal year of his original appointment as a LTJG in the Regular Navy JAGC.  *Id.*

In addition, instead of receiving constructive service credit for three years of law school, Plaintiff only received one year of constructive service credit.  *Id*.  Both of these errors require correction.[21]

### E.    The Court's Resolution.

#### 1.    Governing Precedent.

Plaintiff's claims require the court to analyze the BCNR's May 11, 2004 denial of Plaintiff's December 11, 2003 Application for Correction under the traditional standard of the Administrative Procedure Act.  5 U.S.C. § 706; *see also Clayton* v. *United States*, 225 Cl. Ct 593, 593 (1980) ("Our review of the administrative decision is limited to determining whether the [correction board] action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, *or contrary to law, regulation, or mandatory published procedure* of a substantive nature by which plaintiff has been seriously prejudiced.) (emphasis added).  In addition, to prevail, Plaintiff must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith."  *Doe* v. *United States*, 132 F.3d 1430, 1434 (Fed. Cir.1997) (quoting *Sanders* v. *United States*, 594 F.2d 804, 813 (Cl. Ct. 1979)).  This presumption, however, is not insurmountable.  *Doe*, 132 F.3d at 1437 (holding that the plaintiff overcame the arbitrary and capricious standard in a military discharge case, where the administrative board considered hearsay evidence without allowing the Plaintiff rebuttal); *see also Conn* v. *United States*, 376 F.2d 878, 882 (Ct. Cl. 1967) (invalidating discharge in part, because of the military's failure to follow published procedures.).  For example, if the military elects to issue procedural regulations, they must be followed.  *Murphy* v. *United States*, 993 F.2d at 873 ("When the military is given unlimited discretion by Congress, [in personnel matters] it is nevertheless bound to follow its own procedural regulations if it chooses to implement some.").

#### 2.    The Board For Correction Of Naval Records May 11, 2004 Decision Violated 10 U.S.C. § 1556 And Procedures Established Thereunder.

In this case, the BCNR did not afford Plaintiff the opportunity to comment on the NPC Advisory Opinion, prior to issuing the May 11, 2004 decision denying Plaintiff's December 11, 2003 Application for Correction.  AR at 492.[22]  This action violated 10 U.S.C. § 1556 and the procedures set forth in the BCNR Manual.  Specifically, 10 U.S.C. § 1556 requires the Secretary to provide applicants with copies of "all correspondence and communications" between the agency or board and a person or entity outside the agency or board, "that pertain directly to the applicant's case or have a material effect on the applicant's case."  10 U.S.C. § 1556.  The Secretary's duty to provide copies to an applicant arises before a board makes a final decision,

---

[21] On May 18, 2009, the Government filed a Response to Plaintiff's Supplement Brief.  On June 22, 2009, Plaintiff filed a Reply.  The Government's Response and Plaintiff's Reply focus only on Plaintiff's statutory and constitutional claims.

[22] Subsequently, the BCNR admitted this error in a February 9, 2009 e-mail from a Mr. William Hess of the BCNR to the Department of Defense Office of Inspector General.  AR at 492.

because it concerns applicants "*seeking* corrective action." *Id.* (emphasis added). In addition, the BCNR Manual requires that an applicant seeking correction be provided with a copy of any adverse advisory opinion and be afforded a minimum of thirty days to respond. BCNR Manual at ¶ 704 (AR at 1542).

The Administrative Record evidences that, as early as April 20, 2004, Plaintiff requested an opportunity to comment on any NPC Advisory Opinion in accordance with these procedures. AR at 55. In addition, on May 2, 2004, Plaintiff filed a Supplement to the December 18, 2003 Application for Correction. AR at 151, 192 n. 2. Although the NPC Advisory Opinion at issue is undated, the Administrative Record evidences that the BCNR received this Opinion on May 5, 2004. AR at 248-54. Plaintiff was not provided with a copy of the NPC Advisory Opinion. BCNR computer records also indicate that Plaintiff's May 2, 2004 Supplement was not included in the materials reviewed by the BCNR,[23] before the BCNR issued a denial of correction on May 11, 2004, six days after receiving the NPC Advisory Opinion. AR at 106, 248-54. Subsequently, Plaintiff received a copy of the NPC Advisory Opinion as an enclosure to the BCNR's May 11, 2004 denial. AR at 106.

On April 26, 2005, Plaintiff also provided the BCNR with extensive comments on the NPC Advisory Opinion, but they were never substantively considered, either by the BCNR or the BCNR Executive Director, who incorrectly considered them as a request for reconsideration, that he summarily denied as not material. AR at 28.

In this case, the BCNR's errors were not merely procedural but, as discussed below, also seriously prejudiced Plaintiff's December 18, 2003 Application for Correction, because the BCNR did not have the benefit of a complete record before issuing the May 11, 2004 denial.

> **3. The Board For Correction Of Naval Records May 11, 2004 Decision Erred In Relying On A Navy Personnel Command Advisory Opinion That Failed To Provide A Rational Basis For The Determination Of Plaintiff's Service Date.**

The BCNR's May 11, 2004 Decision relied primarily on the undated NPC Advisory Opinion in denying Plaintiff's December 18, 2003 Application for Correction. AR at 106, 228. The NPC Advisory Opinion, however, focused exclusively on the statutory argument that Plaintiff's total commissioned service should be calculated under 10 U.S.C. § 6388 (1976), the applicable statute when Plaintiff joined the Regular Navy, and did not consider, whether the Navy miscalculated Plaintiff's constructive service credit under DOPMA as alleged in both Plaintiff's May 2, 2004 Supplement and his April 26, 2005 Comments on the NPC Advisory Opinion. AR at 107-12.

Specifically, to implement DOPMA, NAVMILPERSCOM Notice 1821 provided six methods for computing service dates in accordance with SECNAVINST 1821.1. AR at 1280.

---

[23] The BCNR Manual states, "[i]f the petitioner has promised to submit supplementary information, but has not yet provided it, he is given notice and opportunity to do so." AR at 1542.

Assuming *arguendo* that the Navy properly elected to calculate Plaintiff's service date under the "M" or "matched" method,[24] Plaintiff did not receive the correct amount of constructive service credit, as Plaintiff attempted to explain in his May 2, 2004 Supplement and April 26, 2005 Comments on the NPC Advisory Opinion. AR at 158, 162, 212-13. Under the "M" method Plaintiff was matched with a line officer with a service date of 1971. AR at 2022-23 (matching Plaintiff with a Lieutenant Commander Yeatman). Plaintiff's service date then was adjusted for *only one* year, of constructive service credit to 1972. *Id.* (emphasis added). In addition, Plaintiff's 1977 appointment to the Regular Navy (effectively transferring Plaintiff from the Navy Reserve to the Regular Navy) was made, pursuant to 10 U.S.C. § 5578a (1976) (repealed 1981), that provided for the appointment of Regular JAGC officers. AR at 1156. That statute also provided that constructive credit, if given, would be for no less than three years upon such appointment. 10 U.S.C. § 5578a(a)(3) (1976). SECNAVINST 1821.1, required that any such constructive service credit awarded to staff officers upon their initial appointment in a staff corps, be *added* in whole year increments to their "matched" service date. AR at 1275. Since Plaintiff's original appointment was made, pursuant to 10 U.S.C. § 5578a, SECNAVINST 1821.1 requires that Plaintiff's service date be adjusted forward for three years rather than one year. AR at 1275 ("That service date shall be adjusted in whole-year increments to a later service date for each whole year or portion of a year of constructive service credit, which was granted to that Staff Corps Officer *at the time of initial appointment in the staff corps in which serving on 14 September 1981*[.]") (emphasis added). On September 14, 1981, Plaintiff was serving in the Regular JAGC and his initial appointment in that staff corps was made, pursuant to 10 U.S.C. 5578a, requiring no less than three years of credit be awarded upon appointment. 10 U.S.C. §5578a(a)(3). In addition, the Government does not contest that Plaintiff served three years on inactive duty (1971-1974) in the JAGC Student Program while he was in law school. Gov't St. of Facts ¶¶ 1-3.

Since Plaintiff entered active duty on December 27, 1974, a recomputed service date of 1974 is consistent with Plaintiff's actual "active commissioned service" (*i.e.*, the amount time he has spent on active duty as a commissioned officer), as now defined by DOPMA. 10 U.S.C. § 634 (using "years of active commissioned service" to determine service limitations). A service date of 1974 also is consistent with 10 U.S.C. § 533(b) (2009) (stating that constructive service credit should be awarded "[o]ne year for each year of advanced education beyond the baccalaureate degree level, for persons appointed, designated, or assigned in officer categories requiring such advanced education or an advanced degree as a prerequisite for such appointment, designation, or assignment."); *see also* AR at 1153-54.

The NPC Advisory Opinion, however, does not discuss why Plaintiff's service date was only adjusted for one year of constructive service credit. AR at 107-12. Likewise, the August 27, 2002 NPC staff letter sent to Plaintiff shortly after his retirement does not explain why an officer who joined the JAGC Student Program prior to beginning law school would only receive one year of constructive service credit. AR at 149. Instead, the August 27, 2002 explains only

---

[24] Plaintiff did not raise the argument that the Navy should have calculated Plaintiff's service date under the AA method rather than the M method in the BCNR proceeding. This new argument, however, was raised by Plaintiff's counsel in the April 13, 2009 Supplemental Brief and is discussed in the next section of this Memorandum Opinion and Order.

that an officer who joined the JAGC Student Program after 1 year of law school would receive 1 year of constructive service credit and two years of commissioned service for a total of three years of "entry grade credit."  *Id.*  Neither of these NPC documents define "entry grade credit" or how it related to the service date calculations under SECNAVINST 1821.1.  *Id.*[25]  Accordingly, neither the NPC's Advisory Opinion nor the August 27, 2002 NPC staff letter provided a rational basis for the BCNR to determine whether it was "necessary to correct an error or remove an injustice" in Plaintiff's military service record.  10 U.S.C. § 1552(a)(1); *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and *articulate a satisfactory explanation for its action and the choice made* . . . In reviewing that explanation, we must consider whether the decision . . . *was based on a consideration of the relevant factors and whether there has been a clear error of judgment*.") (emphasis added).

In the court's judgment, Plaintiff's May 2, 2005 Supplement and April 26, 2005 comments on the NPC Advisory Opinion provided highly relevant information and insight regarding the computation errors made with respect to Plaintiff's constructive service credit.  AR at 156-65, 191-215.  *Clayton*, 225 Cl. Ct at 593.  Had the BCNR considered Plaintiff's extensive analysis, the correction Plaintiff sought would have been apparent.  Unfortunately, the BCNR never considered any of this information.  AR at 156-65, 191-215.  Likewise, the BCNR Executive Director's July 29, 2005 "reconsideration" denial was based on the same error.  AR at 28.

In addition, the court is unable to determine why Plaintiff's September 20, 1977 permanent appointment to LTJG was backdated, effective December 2, 1972, and his temporary appointment to LT was backdated, effective June 1, 1975.  AR at 1156.  These backdated effective dates suggest that some constructive service credit may have been awarded at the time of his appointment to the Regular Navy, pursuant to 10 U.S.C. § 5578a, but the Administrative Record does not reflect what effect, if any, these dates had on Plaintiff's service date calculation under SECNAVINST 1821.1 and NAVMILPERSCOM Notice 1821.  Therefore, it is not clear whether the "credit" awarded under 10 U.S.C. § 5578a was equivalent to "constructive service credit" for purposes of SECNAVINST 1821.1.

For the reasons discussed herein, the court has determined that, individually and collectively, the errors identified herein prejudiced plaintiff and require a remand to the BCNR.  *Harris* v. *United States*, 14 Cl. Ct. 84, 89 (1987) ("Congress has entrusted the primary duty of correcting military records with the correction boards."); *see also Bateson* v. *United States*, 48 Fed. Cl. 162, 165 (2000) ("In situations where the evidentiary record is found to be inadequate, it is not this Court's role to fill in the evidentiary gaps.  When there are gaps, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or

---

[25] It is important to recognize that the Navy made a distinction between constructive service credit that was awarded as an incentive to recruit certain professionals into the Navy, and inactive duty service, that simply was time spent on inactive duty.  AR at 1339-41 (Nov. 18, 1981 OJAG Memo advocating for the exclusion of inactive duty in the total commissioned service calculation, while allowing service dates to be adjusted for constructive service credit).

explanation, not to have the investigation or explanation performed in this, the reviewing court.")
(internal citations and quotation omitted).

> ### 4. The Board For Correction Of Naval Records Also Should Determine Whether The Navy Used The Wrong Method For Computing Plaintiff's Service Date.

Plaintiff's Supplemental Brief also argues that it was improper for the Navy to use the "Matched" or "M" method for computing his service date under NAVMILPERSCOM Notice 1821 and instead that his service date should have been computed under the "Accepted Appointment" or "AA" method. Pl. Supp. Br. at 36-38.

Notice 1821 described the AA method as follows:

> For a staff corps officer who accepted an *original permanent appointment as an ensign or lieutenant (junior grade) in the regular Navy* and has served continuously on the active list of the Navy since the date of acceptance of appointment, the service date is the fiscal year of appointment. Section 6388 of reference (c) [Title 10 U.S.C], as in effect on 14 September 1981 applies. For staff corps officer who accepted an original appointment as a lieutenant or above in the regular Navy, the service date is computed by matching, method M or MIC (see below).

Notice 1821 ¶ 5.h.(1) (AR at 1280) (emphasis added).

If an officer meets the requirements of method AA, "the service date *is* the fiscal year of appointment." Notice 1821 ¶ 5.h.(1) (AR at 1280) (emphasis added). On September 20, 1977, Plaintiff accepted an *original[26] permanent appointment* as LTJG in the Regular Navy. AR at 1156. Plaintiff served continuously on the active list of the Navy since that appointment. AR at 1152-68 (documenting Plaintiff's service history); Gov't Facts ¶¶ 7-11. Therefore, the Administrative Record appears to support Plaintiff's claim that he met the requirements of the "AA" method.

The AA method states that 10 U.S.C. § 6388 applies to such officers. Notice 1821 ¶ 5.h(1) (AR at 1280).[27] The NPC Advisory Opinion inferred that Notice 1821 "restated the method for computing total commissioned service and assigned service dates to certain regular staff corps officers." AR at 112. This simplistic characterization, however, overlooked the fact that the "method" descriptions in NAVMILPERSCOM Notice 1821 more than merely restate the contents of SECNAVINST 1821.1. Therefore, in relying on NPC's conclusory statement, without analysis, the BNCR erred in failing to explain how and why the method "M" was selected to calculate Plaintiff's retirement date. AR at 148 ("[t]here are no records for the

---

[26] This would be Plaintiff's most recent appointment that was neither a promotion nor a demotion. 10 U.S.C. § 101 (b)(10).

[27] Notice 1821¶ 5.h(1), however, is inconsistent with the Government's argument that 10 U.S.C. § 6388 could not apply to Plaintiff. Gov't Mot at 11-15.

decision [computation of Plaintiff's service date] in your case").  *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43.

Plaintiff's September 20, 1977 appointment, with backdated effective dates, however, raises the issue of whether the appropriate fiscal year of appointment for purposes of method AA was the backdated fiscal year of rank (*i.e.*, 1973) or 1977, the year Plaintiff accepted this appointment.[28]   Without more information, the court cannot ascertain whether Plaintiff's constructive service credit under the AA method would be "added" to the service date calculation.  AR at 1156; *see also Bateson*, 48 Fed. Cl. at 165.

As general rule, failure to present an issue before a correction board waives a later raised claim.  *Doyle* v. *United States,* 599 F.2d 984, 1000-01 (Ct. Cl. 1979), *cert. denied,* 446 U.S. 982 (1980) (applying the exhaustion rule to a plaintiff who failed to raise an issue before a Board for Correction of Military Records).   Congress, however, has authorized the court "to remand appropriate matters to an administrative or executive body or official with such direction as it *may deem proper or just*."  28 U.S.C. § 1491(a)(2) (2006) (emphasis added); *see also Harris*, 14 Cl. Ct at 89 (remanding to a military record correction board when Plaintiff had not previously raised the issue); *Fucik* v. *United States*, 655 F.2d 1089, 1095 (Cl. Ct. 1981) (remanding to administrative board an issue that plaintiff had failed to submit to the board).  In light of the fact that Plaintiff did not have the benefit of counsel before the BCNR, this significant issue was not identified until counsel was secured in this case, and as a remand to the BCNR is required, to recalculate Plaintiff's constructive service credit, the BCNR also should address the proper method for calculating Plaintiff's service date.

## V.   CONCLUSION.

For these reasons, the court denies the Government's August 3, 2007 Motion To Dismiss.[29]  In addition, the court has decided to stay the Government's August 3, 2007 Motion For Judgment On The Administrative Record and Plaintiff's October 18, 2007 Cross-Motion For

---

[28] Federal Fiscal Year ("FY") 1973 began July 1, 1972 so the December 2nd date would be in FY1973, but FY1977 began October 1, 1976 and ended September 30, 1977.  Therefore, Plaintiff's September 20, 1977 appointment fell within FY1977.  Pub. L. No. 93-344, § 501 (1974) (currently codified at 31 U.S.C. § 1102).

[29] In light of this ruling, the court also has decided to defer ruling on Plaintiff's *pro se* July 12, 2007 Motion for Default Judgment, which remains for disposition.

Judgment On The Administrative Record and remand this case to the BCNR, pursuant to RCFC 52.2, with specific instructions to answer the following questions:[30]

1. Pursuant to NAVMILPERSCOM Notice 1821, should the Navy compute Plaintiff's service date under the "AA" or "M" method?

2. If Method "AA" is the proper method for computing Plaintiff's service date, what is Plaintiff's correct service date, given the type of his appointment and date of rank at the time of appointment?

3. If method "M" is the proper method for computing Plaintiff's service date, what is the proper amount of "constructive service credit" that should be awarded to Plaintiff?

4. If Plaintiff's service date and involuntary retirement date should be adjusted, what correction of his military record is required and what accrued pay and benefits are due?

The BCNR is directed to provide the court with a decision within 120 days. The Government is directed to report to the court within 90 days on the status of the remand proceedings.

**IT IS SO ORDERED.**

 s/ Susan G. Braden
SUSAN G. BRADEN
Judge

---

[30] The court is aware that Plaintiff has expressed the view that a remand to the BCNR is futile and also of the emotional burden of further proceedings in light of the recent death of his spouse. The futility exception to the exhaustion requirement, however, does not relieve Plaintiff from the obligation to exhaust administrative remedies. The futility exception has been applied only in situations in which enforcing the exhaustion requirement would mean that parties "would be 'required to go through obviously useless motions in order to preserve their rights.'" *Bendure* v. *United States*, 213 Ct. Cl. 633, 554 F.3d 427, 431 (1977) (quoting *Walsh* v. *United States*, 151 Ct. Cl. 507, 511 (1960)). Plaintiff should understand that a remand is a jurisdictional obligation, not a matter of discretion. If, on remand, the BCNR does not comport with applicable law and Navy regulations, the court has retained jurisdiction to address that situation.