# In the United States Court of Federal Claims

No. 06-827C

Filed: April 30, 2012

**TO BE PUBLISHED**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | Correction of Military Records, 28 U.S.C. § 1491(a)(2) (2006); |
| | Defense Officer Personnel Management Act, Pub. L. No. 96-513, 94 Stat. 2835 (1980); |
| | Manual of Navy Officers Manpower and Personnel Classifications ("NAVPERSCOM") 158391, Vol. I (Sept. 25, 2009); |
| | Military Pay Act, 10 U.S.C. § 1552 (2006); |
| | NAVMILPERSCOM Notice 1821; |
| | SECNAVINST 1821.1; |
| | Tucker Act, 28 U.S.C. § 1491(a)(1) (2006); |
| | 10 U.S.C. § 101(b)(10) (2006) (defining "original appointment" in the same manner as 10 U.S.C. § 101(35) (1964)); |
| FRANK J. PROCHAZKA, | 10 U.S.C. § 634(a) (2006) (Navy retirement required after "30 years of active commissioned service"); |
| Plaintiff, | 10 U.S.C. §§ 1401-09 (2006) (method of computing "monthly military retirement pay"); |
| v. | 10 U.S.C. § 1556 (2006) (requiring notice of communications between the BCNR and the Navy); |
| THE UNITED STATES, | 10 U.S.C. § 5404 (1964) (listing "staff corps"); |
| Defendant. | 10 U.S.C. § 5578(a) (1970) (repealed 1981) (three year minimum service credit for a JAGC officer); |
| | 10 U.S.C. §§ 6376-81 (1964) (repealed 1981); |
| | 10 U.S.C. § 6382(b) (1964) (repealed 1981) (discharge for failure to obtain promotion); |
| | 10 U.S.C. § 6388 (1964) (amended 1968) (prior Navy definition of "total commissioned service"); |
| | 10 U.S.C. § 6388(a) (1976) (repealed 1981) (amended Navy definition of "total commissioned service" in the Supply and Engineers staff corps); |
| | 10 U.S.C. § 6388(b) (1976) (repealed 1981) (amended Navy definition of "total commissioned service" in most staff corps). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Thomas Andrew Coulter**, LeClair Ryan, P.C., Richmond, Virginia, Counsel for Plaintiff.[1]

**Devin Andrew Wolak**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Joseph Robert Berger** and **Scott Arnold**, Dickstein Shapiro, LLP, Washington, D.C., Counsel for National Veterans Legal Service Program, Washington, D.C., *Amicus Curiae* In Support of Plaintiff.[2]

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

In 1980, Congress enacted the Defense Officer Personnel Management Act, Pub. L. No. 96-513, 94 Stat. 2835 (1980) ("DOPMA") requiring, among other directives in this omnibus legislation, that all military services compute an officer's mandatory retirement date, based on "active commissioned service." 10 U.S.C. § 634 (1982). For those officers who had pre-DOPMA and post-DOPMA service, "active commissioned service" was to be computed by adding "service creditable" prior to September 15, 1981, to all subsequent "active commissioned service." DOPMA § 624(a).

The United States Supreme Court has long held that "[C]ongress has the right to give, withhold, distribute, or recall [monetary benefits to military pensioners], at its discretion." *United States* v. *Teller*, 107 U.S. 64, 68 (1883). The Department of the Navy ("Navy"), however, does not have the authority to interpret an Act of Congress, to change an officer's statutorily determined mandatory retirement date, albeit to achieve a personnel policy to advance junior officers. *See United States* v. *Larionoff*, 431 U.S. 864, 869 (1977) (holding that a "'soldier's entitlement to pay is dependent upon statutory right,' and that accordingly the rights of the affected service members must be determined by reference to the statutes and regulations[.]" (quoting *Bell* v. *United States*, 366 U.S. 393, 401 (1961))). But, that is what happened in this case.

Therefore, on December 6, 2006, Plaintiff filed a *pro se* Complaint in the United States Court of Federal Claims, alleging that the Navy erred in interpreting 10 U.S.C. § 6388(b), as amended in 1968,[3] to determine his pre-DOPMA "service creditable" and mandatory retirement

---

[1] The court wishes to express appreciation for the professional services of Thomas A. Coulter and the law firm of LeClair Ryan, P.C. that assumed Plaintiff's *pro se* representation on January 26, 2009.

[2] The court also wishes to express appreciation for the professional services of Joseph R. Berger, Scott Arnold, and the law firm of Dickstein Shapiro, LLP, for presenting the views of *amicus* National Veterans Legal Service Program.

[3] 10 U.S.C. § 6388 has been amended on several occasions. Prior to 1968, there were no relevant amendments. This version of the statute is cited herein as 10 U.S.C. § 6388 (1964). In

date, thereby denying him six years of active duty pay and reducing his monetary pension benefits.

To facilitate review of this Memorandum Opinion and Final Order, the court has provided the following outline:

I.      RELEVANT STATUTORY AND REGULATORY STRUCTURE.

      A.      Retirement In The Navy From December 8, 1967 To September 20, 1968.

      B.      Retirement In The Navy From September 20, 1968 To September 15, 1981.

      C.      Retirement In The Navy After September 15, 1981.

            1.      The Defense Officer Personnel Management Act.

            2.      SECNAVINST 1821.1.

II.     RELEVANT FACTS.

III.    PROCEDURAL HISTORY.

      A.      Initial Proceedings In The United States Court Of Federal Claims.

      B.      Remand Proceedings Before The Board For The Correction Of Naval Records.

            1.      The March 29, 2010 Naval Personnel Command Advisory Opinion.

---

1968, the statute was amended. A new subsection (a) was added and the former subsections (a)-(b) become subsections (b)-(c). After 1968, new subsections (b) and (c) did not change until they were repealed in 1981. Accordingly, the court refers to the post-1968 version of these subsection as "10 U.S.C. § 6388, as amended in 1968" or based upon the first post-1968 codification of the United States Code, *i.e.*, the 1970 codification ("10 U.S.C. § 6388(b)-(c) (1970)"). Subsection (a), however, was amended again in 1970. Accordingly, the court refers to 10 U.S.C. § 6388(a) (Supp. IV 1968) to reference the post-1968, pre-1970, version of subsection (a). The post-1970 version of subsection (a) is cited as 10 U.S.C. § 6388(a) (1970), and refers to the 1970 codification of the United States Code.

A number of other sections of chapter 10 of the United States Code are also relevant. The court cites the version of these statutes that would have been current at the relevant time. When referring to the current statute, the court cites to the most recent codification of the United States Code, *i.e.*, the 2006 codification ("10 U.S.C. § XXXX (2006)"). Since Plaintiff was mandatorily retired in 2002 the court also refers to the codification of the United States Code that was current at the time, *i.e.*, the 2000 codification ("10 U.S.C. § XXXX (2000)").

2.      The March 26, 2010 Office Of The Judge Advocate General's Advisory Opinion, Relying On A Previously Undisclosed 2001 Opinion From The Office Of The Judge Advocate General.

3.      The September 24, 2010 Board For The Correction Of Naval Records Request For A "Supplemental" Advisory Opinion From The Office Of The Judge Advocate General.

4.      The October 25, 2010 Office Of The Judge Advocate General "Supplemental" Advisory Opinion, Rescinded Views Expressed In The March 26, 2010 Advisory Opinion And Plaintiff's Response.

5.      The March 16, 2011 Board For The Correction Of Naval Records Remand Decision Again Denying Plaintiff Relief.

C.    Proceedings In The United States Court Of Federal Claims After March 16, 2011.

IV.    DISCUSSION.

A.    Whether The Navy's 1982 Interpretation Of 10 U.S.C. § 6388(b), as Amended In 1968, Is Entitled To Deference.

1.      Governing Precedent.

2.      The History And Text 10 U.S.C. § 6388(b) (1968) And The Navy's 1982 Interpretation After DOPMA Was Enacted.

3.      Analysis Of The Legislative History Of The Relevant Statutes.

4.      Analysis Of The Other Relevant *Mead* Factors.

a.      The Navy's "Degree Of Care" And "Persuasiveness."

b.      The "Consistency" Of The Navy's Statutory Interpretation.

c.      The Formality Of The Navy's Interpretation.

5.      The Court's Interpretation Of The Text And Legislative History Of 10 U.S.C. § 6388(b), As Amended In 1968, And Other "*Mead* Factors."

B.    Whether SECNAVINST 1821.1 Is "Arbitrary Or Capricious In Substance."

C.    Plaintiff's Mandatory Retirement Date Should Be Computed Under 10 U.S.C. § 6388(b), As Amended In 1968.

D.    Whether This Case Should Be Designated As A Class Action Or "Test Case."

4

V.    CONCLUSION.

I.    **RELEVANT STATUTES AND REGULATIONS.**

The complex and evolving statutory and regulatory structure under which Plaintiff's mandatory retirement date was computed by the Navy requires a detailed explanation to facilitate understanding the relevant facts, procedural history, and legal discussion that follow.

A.    **Retirement In The Navy From December 8, 1967 To September 20, 1968.**

On December 8, 1967, the Judge Advocate General Corps ("JAGC") of the Navy was established by Congress.  *See* Act of Dec. 8, 1967, Pub. L. No. 90-179, 81 Stat. 545 (1967).  At that time, Congress required that the "total commissioned service"

> of each officer *originally* appointed in the grade of lieutenant (junior grade) or ensign in any staff corps of the Navy,[4] who has since that appointment served continuously on the active list of the Navy, [is to be] computed from June 30 of the fiscal year in which he accepted that appointment.

10 U.S.C. § 6388 (1964) (emphasis added) (reproduced at AR 1189).

"Total commissioned service" was used by the Navy to compute: 1) the severance pay of a lieutenant and lieutenant (junior grade) who became subject to an involuntary discharge, if he twice failed to be selected for promotion or received an unsatisfactory rating, 10 U.S.C. § 6382 (1964), and 2) the date on which an officer in a higher grade was subject to mandatory retirement, 10 U.S.C. §§ 6376-80 (1964).  AR 1329.  This application resulted in Navy staff officers with prior experience in the line being treated differently than officers who joined the Navy in the staff corps.  The Navy explained this "disparity" with the following example:

> [A]n officer who has served five years in the line and seven in the Supply Corps, and who is discharged for two failures of selection for promotion, receives severance pay equal to 14 months' basic pay, whereas, if all of his service had

---

[4] Navy officers who serve with a specific professional education or specialized skills may serve as members of one of seven specific "staff corps," *i.e.*, the JAGC, the Medical Corps, the Medical Services Corps, the Dental Corps, the Civil Engineering Corps, the Supply Corps, or the Chaplain Corps.  *See* 10 U.S.C. § 5404 (1964) (listing the applicable staff corps, but not JAGC, that was not authorized until 1967); Manual of Navy Officer Manpower and Personnel Classifications 15839C, Vol. I, at B-1 (Sept. 3, 1975) ("NAVPERSCOM 1975") (listing the staff corps).  The Nursing Corp was, and is, an eighth staff corps, but was treated separately for purposes of determining seniority and pay.  *See, e.g.*, 10 U.S.C. § 6388(d) (1964).

Navy officers who lead and command operational naval vessels and units are classified as line officers.  *See* Manual of Navy Officer Manpower and Personnel Classifications, 15839I, Vol. I, at A-2 (Sept. 25, 2009) ("NAVPERSCOM 2009"); NAVPERSCOM 1975, Vol. I., at B-1.

been in the line, or if all of it had been in the Supply Corps, he would have received 24 months' basic pay, which is the maximum allowable severance payment.

On the other hand, if such an officer attains the grade of lieutenant commander and fails of selection for promotion two or more times, he cannot be retired until he has completed 25 years of active duty as an officer, whereas his contemporaries are mandatorily retired five years earlier. . . .  This situation has resulted in some stagnation in the grades of lieutenant commander and above.

AR 1297.

On June 3, 1968, the Secretary of the Navy sent a letter to the Speaker of the House requesting that Congress amend 10 U.S.C. § 6388 (1964) to address this situation, but only for officers in the Supply Corps and the Civil Engineering Corps:

[I]n the case of many officers of the Supply Corps and the Civil Engineering Corps who had prior service in the line, the definition of total commissioned service in 10 USC [§] 6388 works to the detriment of passed over lieutenants and to the advantage of those who reach higher grades.  Both results are inequitable, and the second is especially undesirable from the personnel management standpoint.

The proposed legislation would eliminate these inequities by providing that the total commissioned service of each officer of the Regular Navy in the Supply Corps or the Civil Engineering Corps who has served continuously since his original appointment as a Regular or Reserve in the grade of ensign in the line or any staff corps or in the grade of lieutenant (junior grade) in the Civil Engineering Corps shall be computed from June 30 of the fiscal year in which he accepted his initial appointment.  Thus all of his active commissioned service would count for all purposes.

AR 1330.

The Navy also requested that a savings clause be included to ensure that staff corps officers who accepted appointments under the pre-1968 regime were not adversely affected, as "[t]hey were tendered their appointments and accepted them in good faith and are undoubtedly relying, at a minimum, upon continued active service for the periods authorized by law for officers in their current grades."   AR 1330.  Both the House and Senate Committee Reports adopted the Navy's rationale verbatim in the congressional history for the subsequent amendments to 10 U.S.C. § 6388 adopted by Congress.  *See* H.R. Rep. No. 90-1751 at 4 (1968) (reproduced at AR 1326); S. Rep. No. 90-1503 at 4 (1968).

**B.      Retirement In The Navy From September 20, 1968 To September 15, 1981.**

On September 20, 1968, Congress passed "An Act To amend title 10, United States Code, to correct an inequity affecting officers of the Supply Corps and Civil Engineering Corps of the Navy." *See* Pub. L. No. 90-502, 82 Stat. 852 (1968) ("the 1968 Act") (reproduced at AR 1321). The 1968 Act amended 10 U.S.C. § 6388 in two ways. First, a new section 6388(a) was added to specify how "total commissioned service" would be computed, but only for members of the Supply Corps and the Civil Engineer Corps.

The new section 6388(a) provided:

> For the purpose of the preceding sections of this chapter, the total commissioned service of each officer on the active list of the Navy in the Supply Corps or the Civil Engineer Corps who was initially appointed as a Regular or as a Reserve in the grade of ensign in the line or any staff corps or in the grade of lieutenant (junior grade) in the Civil Engineer Corps and who has served continuously on active duty since that appointment shall be computed from June 30, of the fiscal year in which he accepted that appointment.

> SEC. 2.  Notwithstanding any other provision of law, an officer of the Navy in the Supply Corps or the Civil Engineer Corps who is not selected for promotion to a higher grade after the enactment of this Act may not be retired under chapter 573 of title 10, United States Code, earlier than he would have been retired had this Act not been enacted.

Pub. L. No. 90-502, subsection (6).

In addition, the 1968 Act substituted the prior version of section 6388(a) with a new section 6388(b) that specified how the "total commissioned service" would be computed for all other staff corps officers and replaced the term "originally" with "initially." This new provision required "total commissioned service" be computed for

> each officer *initially* appointed in the grade of lieutenant (junior grade) or ensign in any staff corps of the Navy *except the Supply Corps and the Civil Engineer Corps*, who has since that appointment served continuously on the active list of the Navy, is computed from June 30 of the fiscal year in which he accepted that appointment.

10 U.S.C. § 6388(b) (Supp. IV 1968) (emphasis added to indicate new statutory language).

Four years after Congress passed the 1968 Act, the Acting Navy JAG issued an August 17, 1972 internal memorandum to the Chief of Naval Personnel, who requested guidance in applying the 1968 Act to an individual officer, as well as "to other officers of the staff corps of the Regular Navy." AR 1374-79 ("the Acting Navy JAG 1972 Memorandum"). This officer was appointed as an ensign in the line of the Regular Navy in 1965, was transferred to the Supply Corps in 1967 in the grade of ensign with a concurrent promotion to lieutenant (junior

grade), was promoted to the grade of lieutenant in 1969, and received a permanent appointment to the JAGC in 1971 as a lieutenant (junior grade) with a temporary appointment in the grade of lieutenant.  AR 1374.  In response, the Acting Navy JAG advised that, because this individual was "not now a Regular Navy officer of the Supply or Civil Engineer Corps, he does not fit the criteria of a '10 U.S.C. [§] 6388(a)-type' officer."  AR 1375.  In addition, since this particular officer was "not initially appointed to the active list in any staff corps (other than the Supply Corps or the Civil Engineer Corps) (he was initially appointed a *Regular line officer*), he does not fit the criteria of a '10 U.S.C. [§] 6388(b)-type officer.'"  AR 1375.  Therefore, the Acting Navy JAG turned to see if this officer could, "for purposes of computing his total commissioned service, be considered as an 'other' officer under 10 U.S.C. [§] 6388(c)."  AR 1376.

Section 6388(c) provided:

Each other commissioned officer on the active list of the Navy in any staff corps is considered to have the same total commissioned service for the purpose of the preceding sections of this chapter as the officer in his corps described in subsection (a) or (b) having the maximum total commissioned service who—

(1)     has not lost numbers or precedence; and

(2)     is, or at any time has been, junior to the other officer for the purposes of eligibility for promotion and selection for promotion during that other officer's latest period of continuous service on the active list.

10 U.S.C. § 6388(c) (1970).[5]

The Acting Navy JAG, however, concluded that "no officer appointed in the JAG Corps meets all of the criteria set forth in 10 U.S.C.[§] 6388(c) in order to establish . . . total commissioned service," because there were no "'10 U.S.C. [§] 6388(b)-type' officer[s] on the active list of the JAG Corps[.]"  AR 1376.  Based on this analysis, the Acting Navy JAG advised that no "officer on the active list in the [JAGC] and in other corps [could] have . . . accumulated any total commissioned service for the purposes of chapter 573 of title 10, U.S.C.[,]" since no JAGC officer could be "matched" with a suitable junior officer in his staff corps, as required by 10 U.S.C. § 6388(c), since none existed.  AR at 1376-77.  Consequently, he concluded that there was no method to compute the "total commissioned service" of officers who entered the Navy through the JAGC.  AR at 1376-77.[6]

---

[5] Section 6388(c) was a "savings provision," that allowed the Navy to "match" an officer, who did not qualify to have his "total commissioned service" computed under Section 6388(b), with another officer from the same staff corps whose "total commissioned service" could be computed.

[6] This conclusion also applied to officers who entered the Navy through the JAGC Student Program that recruited prospective law students to serve in the United States Naval Reserve on inactive duty, with the rank of ensign in the line, while they obtained a law degree. AR at 1419-20.  These students, however, attended law school at their own expense and did not receive military pay or allowances, unless they were called to active duty.  AR at 1419-20.  The

The Acting Navy JAG's 1972 Memorandum described this situation as "a problem" (AR 1377) and recommended that the Navy seek "to amend the statute [10 U.S.C. § 6388] (as was done for the Supply Corps and Civil Engineering Corps in 1968) . . . . in view of the apparently large numbers of officers involved[.]"  AR 1377-79.  The Administrative Record does not evidence that the Navy took any action and no legislation was introduced by Congress at that time.

In January 1975, the Acting Navy JAG prepared another internal Memorandum for the Chief of Naval Personnel ("the Acting Navy JAG 1975 Memorandum"), in which the issues identified in the Acting Navy JAG's 1972 Memorandum were reiterated, but a draft amendment to 10 U.S.C. § 6388 was attached to "change computation of total commissioned service."  AR 1380-81.  Later that year, omnibus legislation for overhauling appointments, promotions, and retirement for all military services was first introduced in Congress.  *See* 121 Cong. Rec. 30,441 & 30,454 (1975) (Senate); *see also* 122 Cong. Rec. 29,923 (1976) (House).  Five years passed before Congress enacted this legislation.

## C.    Retirement In The Navy After September 15, 1981.

By that time, each of the military services had a different method of computing "total commissioned service."  Therefore, in 1980, Congress enacted the Defense Officer Personnel Management Act ("DOPMA"), to "revise and standardize the provisions of law relating to appointment, promotion, separation, and mandatory retirement of regular commissioned officers of the Army, Navy, Air Force, and Marine Corps," among other issues. Pub. L. No. 96-513 (1980).  DOPMA became effective on September 15, 1981.  *See* DOPMA § 704.

### 1.    The Defense Officer Personnel Management Act.

Under DOPMA, a Captain in the Regular Navy was required to retire upon completing 30 years of "active commissioned service," unless he was promoted to Rear Admiral or retired earlier.  *See* 10 U.S.C. § 634(a) (1982) (providing that officers in the Regular Navy with the grade of Captain who were not selected for promotion, "shall, if not earlier retired, be retired on the first day of the month after the month in which he completes thirty years of active commissioned service").[7]

---

only benefit the student obtained was the accrual of "longevity credit," which, if and when he was placed on active duty, would result in higher military pay.  AR at 1419-20.  Following law school graduation and admission to a state bar, a JAGC Student Program participant also was afforded the opportunity to attend the Naval Justice School ("NJS") on active duty status.  AR at 1419-20.  After successful completion of the NJS, a JAGC Student Program participant became eligible to receive an appointment as a Reserve Officer in the JAGC, but with an obligation to serve on active duty thereafter for a minimum period of four years.  AR at 1419-20.

[7] Currently, limited exceptions to this general rule may apply, but are not relevant to this case.  *See, e.g.*, 10 U.S.C. § 634(b)(2) (2006) (excepting officers who are professors at the United States Naval Academy from mandatory retirement); 10 U.S.C. § 637(b)(1) (2006) (allowing

DOPMA, however, also included transition provisions to "enable the officers covered by [the transition provision] to retain the years of service with which they were credited for purposes of mandatory retirement or discharge, prior to the effective date of the Act."  H.R. Rep. No. 96-1462 at 148 (1981).  One such provision provided that "active commissioned service" for officers who had already accumulated service credit prior to DOPMA's enactment would be computed by adding –

> (1) the amount of service creditable[8] to such officer on the day before the effective date of this Act [*i.e.*, Sept. 15, 1981] for the purpose of determining whether the officer is subject to involuntary retirement or discharge; and

> (2) all subsequent active commissioned service of such officer.

DOPMA, § 624(a).

In other words, a Navy officer's mandatory retirement date was computed by adding pre-DOPMA "total commissioned service" to post-DOPMA "active commissioned service."

Another transition provision provided:

> In the case of an officer for whom no means of computing service creditable in determining whether the officer is subject to involuntary retirement or discharge existed under the law in effect on the day before the effective date of [DOPMA], the amount of creditable service of such officer for such purpose for the period before the effective date of [DOPMA] shall be determined under regulations prescribed by the Secretary of Defense, except that such an officer may not be credited with an amount of service less than the amount of his active commissioned service.

DOPMA, § 624(b).

---

officers to be retained on active duty "subject to the needs of the service," as determined by an appropriately convened selection board).

[8] As previously discussed, "total commissioned service" under 10 U.S.C. § 6388(b), as amended in 1968, was the method used by the Navy to determine whether an officer was or would be subject to involuntary or mandatory retirement prior to the implementation of DOPMA.

### 2.   SECNAVINST 1821.1.

On January 29, 1982, the Secretary of the Navy ("Secretary") issued SECNAVINST 1821.1 ("SACNAVINST 1821.1")[9] (reproduced at AR 1271-77), concluding:

> Certain Regular officers in the Medical Corps, Dental Corps, Medical Service Corps, Chaplain Corps, and Judge Advocate General's Corps do not have matching officers who satisfy all the criteria of section 6388.  Accordingly, it is not possible under the laws in effect prior to 15 September 1981 to compute total commissioned service for those Regular officers in those staff corps.

AR 1272 ¶ 3.b.

Under SECNAVINST 1821.1, a matching system was established, whereby "service creditable," *i.e.*, "total commissioned service," was computed so that each staff corps officer whose total commissioned service could not be computed under the law existing on September 14, 1981 would be considered to have the same "total commissioned service" as

> the commissioned officer with the maximum active commissioned service on the active list and/or active-duty list of the Navy who:
>
> (1) has served continuously on the active list of the Navy since the date of acceptance of appointment in the grade of ensign either upon graduation from the Naval Academy or under section 2106, 2107, or 6909 of Title 10, <u>United States Code</u> (as in effect on 14 September 1981), computed from June 30 of the fiscal year in which the matching officer (not the Staff Corps Officer) accepted that appointment;
>
> (2) has not lost numbers or precedence or failed of selection for promotion; and
>
> (3) is, or at any time, has been junior to the Staff Corps Officer for the purposes of eligibility for promotion and selection for promotion during that Staff Corps Officer's latest period of continuous service as a Staff Corps Officer on the active list and/or active-duty list of the Navy.

AR 1274-75 ¶ 6a(1)-(3).

"Total commissioned service" then was used to determine the assignment of a "service date."  AR 1275 ¶ 6a(3).

---

[9] SECNAVINST 1821.1 was promulgated without notice-and-comment rulemaking. *See* Administrative Procedure Act, 5 U.S.C. § 553(a)(1) (1982) ("Rule making") ("This section applies, according to the provisions thereof, except to the extent that there is involved—(1) a military or foreign affairs function of the United States[.]").

Next, the service date was adjusted,

in whole-year increments to a later service date for each whole year or portion of a year of constructive service credit,[10] which was granted to that Staff Corps Officer at the time of initial appointment in the staff corps in which serving on 14 September 1981, or, at the time of designation as an SDO (Law) officer, in the case of a Staff Corps Officer in the Judge Advocate General's Corps who was serving as a SDO (Law) Reserve officer when [DOPMA] was enacted. Notwithstanding any other provision of this subparagraph, a Staff Corps Officer's service date may not be adjusted to a later date under the preceding sentence by an amount which exceeds the following: three years for an officer in the Chaplain Corps or Judge Advocate General's Corps and five years for an officer in the Medical Corps, Dental Corps or Medical Service Corps.

AR 1274-75 ¶ 6a(3).

If a staff corps officer's "active commissioned service" exceeded "total commissioned service," "total commissioned service" was deemed to be the equivalent of "active commissioned service," for purposes of determining involuntary retirement or discharge.  AR 1275 ¶ 6b.

The Commander of the Naval Personnel Command ("NPC") was responsible for computing and notifying all affected officers of their service dates.  AR 1276 ¶ 8.  Pursuant to this authority, the NPC Commander issued NAVMILPERSCOM Notice 1821 (Dec. 13, 1982) ("Notice 1821") (reproduced at AR 1278-85).  Attached to Notice 1821 was a list of all staff corps officers and their service dates.  AR 1279 ¶ 5.g; *see also* AR 1979-2032 (list of all staff corps officers attached to Notice 1821).[11]  Notice 1821 explained that each of the service dates was computed using one of six different methods, authorized by SECNAVINST 1821.1.  AR 1280 ¶ 6.h.

In 1993, SECNAVINST 1821.1 was cancelled, pursuant to SECNAV Note 5215 (1993), for having "served its purpose."  AR 1271.

---

[10] "Constructive service credit" was defined as "[s]ervice credit . . . granted for satisfactorily completed advanced education, training, or baccalaureate degree" and determined when an officer was appointed to a staff corps, affording that officer credit for time spent to obtain an advanced education prior to enlistment.  AR 1275 ¶ 6(3).

[11] This list included an officer's name, social security number, a letter designation of the method of calculation used, the base service date assigned (or "matched"), the years (if any) of constructive service credit given, and the final assigned service date.  AR at 1279-80, 1977-78.

## II.  RELEVANT FACTS.[12]

On July 8, 1971, Plaintiff entered the Navy JAGC Student Program and accepted a permanent appointment as an unrestricted line officer on inactive duty in the Naval Reserve, with the grade of ensign.  AR 1153, 1160, 1164.  Thereafter, he attended law school at his own expense.  AR 115.  On January 1, 1973, Plaintiff received a temporary appointment, as an unrestricted line officer Lieutenant (junior grade), effective as of December 2, 1972, and served on active duty while he attended a training course in the summer of 1973.  AR 1153, 1157.  In the summer of 1974, Plaintiff graduated from law school.  AR 115.

On December 27, 1974, Plaintiff began active duty service in the Naval Reserve JAGC.[13]  AR 1153-54.  On April 14, 1975, he accepted a permanent appointment in the Naval Reserve JAGC, with the rank of a lieutenant (junior grade).  AR 1163.  On June 26, 1975, he received a temporary appointment in the Naval Reserve JAGC as a Lieutenant, the next highest grade, and continued on active duty service.  AR 1162.

On September 20, 1977, Plaintiff transferred[14] from the Naval Reserve JAGC to the Regular Navy JAGC, at which time he simultaneously was separated from active duty in the Naval Reserve JAGC and permanently appointed as a lieutenant (junior grade) in the Regular Navy JAGC, on active duty, with a backdated "date of rank" of December 2, 1972.[15]  AR 1154, 1156, 1159.  On the same date, Plaintiff also received a temporary appointment as a Lieutenant in the Regular Navy JAGC, with a backdated "date of rank" of June 1, 1975.  AR 1156.  Thereafter, Plaintiff continued on active duty in the Regular Navy JAGC and on October 1, 1994, he received a permanent appointment as a Captain in the Navy JAGC.  AR 1152.

On December 21, 2000, the Navy notified Plaintiff that he would be involuntarily retired on July 1, 2002, pursuant to 10 U.S.C. § 6377.[16]  AR 123.  Pursuant to SECNAVINST 1821.1

---

[12] The relevant facts discussed herein were derived from the July 23, 2007 Administrative Record ("AR") and enclosures attached to a March 16, 2011 Board for the Correction of Naval Records Decision ("3/16/11 *BCNR Dec*.").

[13] Plaintiff's "active duty base date," however, was listed as November 2, 1974.  AR 1153.  Neither the Administrative Record nor the parties have explained this inconsistency.

[14] Plaintiff's transfer was characterized in the Administrative Record as an "augmentation."  3/16/11 *BCNR Dec*., Encl. 15, at 17.

[15] Neither the Administrative Record nor the parties have explained why Plaintiff's "date of rank" was backdated.  It appears, however, that the Navy determined, at that time, to use 1972 as the year from which it would determine when Plaintiff achieved 30 years of active duty.

[16] The Navy's December 21, 2000 letter to Plaintiff cites 10 U.S.C. § 6377 as the authority for mandatorily retiring Plaintiff after 30 years of "commissioned service," despite the fact that section 6377 was repealed by DOPMA.  Presumably, the Navy intended to refer to 10 U.S.C. § 634(a) (2000) (governing mandatory retirement post-DOPMA).

and Notice 1821, Plaintiff's "service creditable," *i.e.*, "total commissioned service," was computed per the "Matched" or "M" method.[17]   AR 1272 ¶ 3.b, 1284; *see also* AR 2018-23 (list of all JAGC officers' service dates).

Under the "M" method, Plaintiff was matched with a line officer with a service date of 1971. AR 2022, 2024 (Notice 1821 matching Plaintiff with a Lieutenant Commander Yeatman).   Then, Plaintiff's service date was adjusted for one year of constructive service credit to 1972.   AR 2024.   The Navy's reasoning for granting Plaintiff only one year of constructive service is not explained in the Administrative Record, apparently because the Navy has been unable to locate Plaintiff's records explaining this adjustment.   3/16/11 *BCNR Dec.* at 12 ("Over those 20 years [since Plaintiff's constructive service credit was computed], personnel have transferred and retired, memories have faded and records have been disposed of."); *see also* AR 147 (Aug. 27, 2002 letter from J.F. Morgan, Jr., an unidentified Assistant Legal Counsel (presumably for the Navy) to Plaintiff stating: "I do not know if we ever had files that would have allowed us to answer all your questions directly.   I know that we do not have such files now.").   Since Plaintiff had achieved the grade of Captain, his mandatory retirement date was computed by adding 30 years to his service date plus one year of constructive credit, *i.e.*, June 30, 1972, resulting in a mandatory retirement date of July 1, 2002.   AR at 123 (citing 10 U.S.C. § 6377).

On June 30, 2002, Plaintiff involuntarily was retired from the Navy for "maximum service or time in grade."   AR 1166.   His actual "active duty"[18] however, was 27 years, 7 months, and 28 days.   AR 1166.   His "inactive duty," while a participant in the JAG Student Program, was 3 years, 3 months, and 25 days.   AR at 1165.   Plaintiff's retirement pay was determined by his years of "active service," defined at 10 U.S.C. § 101(d)(3) (2000) as "service on active duty."   *See* 10 U.S.C. §§ 1401, 1405-06, 1409 (2000) (computing monthly military

---

[17] The "Matched" or "M" method provided:

The rank, date of rank, and precedence number of the staff corps officer at the time of augmentation into the regular Navy is compared to the first regular Navy officer who is junior on the matching officer list.   The service date of the matching officer is assigned as the base year from which the staff corps officer's date is determined by adding constructive credit.   *Reference (a) [i.e., SECNAVINST 1821.1] applies.*

AR 1280 ¶ 5.h(4) (emphasis added).

[18] "[A]ctive duty" is defined as "full-time duty in the active military service of the United States[.]"   10 U.S.C. § 101(d)(1) (2000).

Active *duty* is different than active *status*.   For example, a Naval Reserve officer may be classified in "active status," but not on "active duty."   *Compare* 10 U.S.C. § 101(d)(1) (2000) (definition of "active duty"), *with* 10 U.S.C. § 101(d)(4) (2000) ("'[A]ctive *status*' means the status of a member of a reserve component who is not in the inactive Army National Guard or inactive Air National Guard, on an inactive status list, or in the Retired Reserve." (emphasis added)).

retirement pay by multiplying a service member's base monthly salary at the grade he/she retired by 2 1/2 percent of the years of active service).[19]   The 3 years, 3 months and 25 days Plaintiff spent in the JAG Student Program were counted towards computing his pre-DOPMA "total commissioned service" to reach 30 years of "active commissioned service," but not credited in determining his monthly military retirement pay.   AR 124-34.

## III.   PROCEDURAL HISTORY.

### A.   Initial Proceedings In The United States Court Of Federal Claims.

The procedural history from the date the December 6, 2006 Complaint was filed in the United States Court of Federal Claims to December 10, 2009, is set forth in a Memorandum Opinion and Order, wherein the court determined that it had jurisdiction to adjudicate the claims alleged in a February 5, 2007 Amended Complaint, pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006), and the Military Pay Act, 10 U.S.C. § 1552 (2006).   *See Prochazka* v. *United States*, 90 Fed. Cl. 486, 488-89 (2009) ("*Prochazka I*").   The court also determined that it had jurisdiction, pursuant to 28 U.S.C. § 1491(a)(2), to correct Plaintiff's military records, to the extent necessary to compensate Plaintiff for the denial of active duty pay and reduced retirement pay.   *See Prochazka I*, 90 Fed. Cl. at 489.   The court, however, determined that the allegations in the February 5, 2007 Amended Complaint regarding the Navy's interpretation of 10 U.S.C. § 6388(b), as amended in 1968 were not ripe for adjudication. *Id.*   As the court explained, the Board for the Correction of Naval Records ("BCNR") violated 10 U.S.C. § 1556 (2006), and its own internal procedures, by failing to allow Plaintiff to comment on a May 5, 2004 NPC Advisory Opinion, prior to relying on that Opinion and issuing its May 11, 2004 decision.   *Id.* at 490-93.   The court also determined that the BCNR's error was prejudicial because the May 5, 2004 NPC Advisory Opinion failed to provide a rational basis for how the Navy's determination of Plaintiff's "service date" was computed.   *Id.* at 494.   In addition, the court requested that the BCNR explain why Plaintiff was awarded only one year of constructive service credit, instead of three years (for each year that he attended law school) in calculating his service date and mandatory retirement date.   *Id.* at 494-96 (citing 10 U.S.C. § 5600).

The court determined, assuming *arguendo* that Plaintiff's involuntary date of retirement must be computed under SECNAVINST 1821.1 and Notice 1821, that the BCNR should have the opportunity in the first instance to consider Plaintiff's alternative argument that, even under SECNAVINST 1821.1, his service date should have been determined under the "AA" method[20]

---

[19]   The monthly military retirement pay for an officer who served for 30 years on "active duty," is 75 percent of the member's "active duty" base monthly salary.   *See* 10 U.S.C. §§ 1401, 1409 (2000).

[20]   The "Accepted Appointment" or "AA" method provided:

For a staff corps officer who accepted an *original* permanent appointment as an ensign or lieutenant (junior grade) in the regular Navy and has served continuously on the active list of the Navy since the date of acceptance of appointment, the service date is the fiscal year of appointment.   *Section 6388 of*

described in Notice 1821, instead of the "M" method.  *Id.* at 496-97 (citing 10 U.S.C. § 101(35) (1976)).[21]

B.   **Remand Proceedings Before The Board For The Correction Of Naval Records.**

On remand, the BCNR requested an advisory opinion from the NPC and the Office of the Judge Advocate General ("OJAG").  *See* 3/16/11 *BCNR Dec.*, Doc. 84 at 1.  Both the NPC and the OJAG recommended that Plaintiff's records should not be corrected, but for different reasons.

1.   **The March 29, 2010 Naval Personnel Command Advisory Opinion.**

On March 29, 2010, the NPC issued an advisory opinion,[22] reaffirming the Navy's interpretation of 10 U.S.C. § 6388(b), as amended in 1968, and its decision to compute Plaintiff's "service creditable," *i.e.*, "total commissioned service," under SECNAVINST 1821.1 and Notice 1821 as "a matter of policy implementation of statutory law[.]"  2010 NPC Op. at 2 (attached to

---

[chapter 10 of the United States Code], as in effect on 14 September 1981, applies.   For staff corps officers who accepted an original appointment as a lieutenant or above in the regular Navy, the service date is computed by matching, method M or MIC[.]

AR 1280 ¶ 5.h(1) (emphasis added).

[21] The United States Court of Federal Claims also instructed the BCNR, on remand, to address four issues:

1. Pursuant to NAVMILPERSCOM Notice 1821, should the Navy compute Plaintiff's service date under the "AA" or "M" method?

2. If method "AA" is the proper method for computing Plaintiff's service date, what is Plaintiff's correct service date, given the type of his appointment and date of rank at the time of appointment?

3. If method "M" is the proper method for computing Plaintiff's service date, what is the proper amount of "constructive service credit" that should be awarded to Plaintiff?

4. If Plaintiff's service date and involuntary retirement date should be adjusted, what correction of his military record is required and what accrued pay and benefits are due?

*Prochazka I*, 90 Fed. Cl. at 498.

[22] This advisory opinion corrected a prior March 15, 2010 NPC decision.  *See* 3/16/11 *BCNR Dec.*, Doc. 84, Encl. 3 ("2010 NPC Op.").

3/16/11 *BCNR Dec.*, Encl. 3); *see also id.* at 3-4, 8-10.   The NPC responded to the court's remand questions by restating that the Navy properly applied the "M" method in calculating Plaintiff's service date because Plaintiff "augmented" into the Regular Navy as a lieutenant (junior grade) and, under Notice 1821, the "M" method is the proper method to apply to reserve officers who augment into the Regular Navy.   *See* 2010 NPC Op. at 2-3.   The NPC, however, declined to address the applicability of the AA method to compute Plaintiff's service date.   *See* 2010 NPC Op. at 3-4.

The NPC also concluded that Plaintiff was not entitled to any further constructive service credit.   *See* 2010 NPC Op. at 4-8.   Although 10 U.S.C. § 5600 (1976) (repealed 1996) required that a JAGC officer receive at least three years of service credit adjustment, that statute applied only to "a person who is *not already* an officer in an armed force."   10 U.S.C. § 5600 (emphasis added).   Plaintiff, however, was already an officer when he entered JAGC in 1974, after serving three-and-one-half years in law school as a line officer with the grade of ensign on inactive duty. *See* 2010 NPC Op. at 4-5.   Therefore, 10 U.S.C. § 5600 did not apply to Plaintiff.   *Id.*

Nor was Plaintiff entitled to any additional constructive service credit, pursuant to 10 U.S.C. § 5578a, because that statute only guarantees JAGC officers three years of credit "for the purposes of determining the lineal position, permanent grade, seniority in permanent grade, and eligibility for promotion[.]"   *Id.* at 6.   It "does not address the amount of [constructive] service [credit] to be awarded for purposes of adjustment of total commissioned service."   *Id.*   Therefore, to the extent that the court was under the impression that Plaintiff may be entitled to additional constructive service credit under 10 U.S.C. § 5578a, the NPC explained that the court "mix[es] apples (lineal position, permanent grade, seniority in permanent grade, and eligibility for promotion) with oranges (total commissioned service adjusted to a later date [under Notice 1821])."   *Id.*   The NPC questioned why Plaintiff was granted even one year of constructive service credit but, since this error worked to Plaintiff's advantage, it was deemed harmless.   *Id.* at 6-8.   Accordingly, NPC concluded that no correction should be made to Plaintiff's service date for constructive service credit.   *Id.* at 7.

> **2.    The March 26, 2010 Office Of The Judge Advocate General's Advisory Opinion, Relying On A Previously Undisclosed 2001 Opinion From The Office Of The Judge Advocate General.**

On March 26, 2010, the OJAG issued an advisory opinion for the BCNR ("2010 OJAG Op.") that concluded that Plaintiff was not entitled to the requested corrective relief.   *See* 3/16/11 *BCNR Dec.*, Doc. No. 84, Encl. 4. The 2010 OJAG advisory opinion adopted the reasoning of a prior October 26, 2001 OJAG opinion ("2001 OJAG Op."), prepared in response to Plaintiff's June 6, 2001 letter to the Navy, but not previously disclosed to Plaintiff (despite his requests). *See* 2010 OJAG Op. at 1 (citing "reference (c)").   The 2001 and 2010 OJAG advisory opinions both concluded that Plaintiff's "total commissioned service" should have been computed under 10 U.S.C. § 6338(b), as amended in 1968, but not for the reasons advanced by 2010 NPC Op. The 2001 and 2010 OJAG advisory opinions concluded that Plaintiff's September 20, 1977 appointment into the Regular Navy was as a lieutenant and not as a lieutenant (junior grade).   *See* 2010 OJAG Op. at 2 (citing 2001 OJAG Op. at 7-12).

Although Plaintiff's commission into the Regular Navy created an "ambiguity" by listing his permanent rank as a "lieutenant (junior grade)," in fact, he was a lieutenant because he entered active duty with a temporary appointment as a lieutenant, was paid as a lieutenant, and wore the uniform of a lieutenant. *See* 2001 OJAG Op. at 9. Moreover, only an appointment as full lieutenant would have been "in line [*i.e.*, consistent] with then-existing JAGC accession policies" and with the treatment of other similarly situated officers. *See* 2001 OJAG Op. at 10.

The 2001 OJAG advisory opinion further noted that *if* Plaintiff had been appointed to the Regular Navy as a lieutenant (junior grade) in 1977, it would have been possible to compute his "total commissioned service," pursuant to 10 U.S.C. § 6388(b), as amended in 1968, because:

> This section [§ 6388(b)] as enacted used the word "originally" vice "initially." 10 U.S.C. § 6388(b) as amended by U.S. Code, 1976, substitutes the word "initially" for "originally." The legislative history is silent on the reason behind this change. An officer's first appointment in a staff corps is an original appointment; *thus, substituting "initially" for "originally" would not alter the meaning of the statute.*

2001 OJAG Op. at 7 n.23 (emphasis added).

The March 26, 2010 OJAG advisory opinion did not directly address the court's first remand question, *i.e.*, whether the "M" or "AA" method should have been used to compute Plaintiff's total commissioned service. *See generally* 2010 OJAG Op. The 2010 OJAG Opinion, however, did address the court's third remand question, concluding that Plaintiff is not entitled to any additional "constructive service credit," because credit awarded for purposes of eligibility for promotion is distinct from the "constructive service credit" awarded for mandatory retirement purposes under SECNAVINST 1821.1. The "second type of credit . . . represents time spent in law school where the Student Program member *was not commissioned as an officer in the Navy*, whether active or inactive." 2010 OJAG Op. at 2 (emphasis added). Consequently, a JAGC officer is entitled to "constructive service credit" only for years spent in law school *prior* to accepting an appointment as an ensign in the line on inactive duty in the Navy. *See* 2010 OJAG Op. at 2-3. This is also consistent with the fact that the JAGC officers listed in SECNAVINST 1821.1 and Notice 1821 received "constructive service credit" that varied between 0-3 years. *See* 2010 OJAG Op. at 3.

### 3. The September 24, 2010 Board For The Correction Of Naval Records Request For A "Supplemental" Advisory Opinion From The Office Of The Judge Advocate General.

After receiving Plaintiff's comments on the March 15, 2010 NPC advisory opinion and March 26, 2010 OJAG advisory opinion, on September 24, 2010, the BCNR requested a "supplemental" advisory opinion from the OJAG, to address whether the March 26, 2010 OJAG

advisory opinion could be "harmonized" with the March 15, 2010 NPC advisory opinion.[23]  *See* 3/16/11 *BCNR Dec*., Doc. No. 84, Encl. 13 at 3.  The BCNR did not request a supplemental advisory opinion from the NPC.

### 4.   The October 25, 2010 Office Of The Judge Advocate General "Supplemental" Advisory Opinion, Retracting Views Expressed In The March 26, 2010 Advisory Opinion And Plaintiff's Response.

On October 25, 2010, without performing any additional analysis, the OJAG issued a "supplemental advisory opinion" adopting the March 15, 2010 NPC advisory opinion's interpretation of 10 U.S.C. § 6388, as amended in 1968, explaining that "[t]he discussion in [the 2001 OJAG advisory opinion and March 26, 2010 OJAG advisory opinion] . . . is in error to the extent it states or implies that [Plaintiff's] 1977 appointment [into the Regular Navy] is the relevant appointment for purposes of 10 U.S.C. § 6388(b)."  10/25/10 OJAG Supp. Op. at 2.  The OJAG further advised the BCNR that the 2001 OJAG Opinion "was never adopted as OJAG['s] . . . official opinion on, among other things, the issue of whether [Plaintiff's] 1977 appointment was 'initial' for purposes of 10 U.S.C. § 6388(b)[.]"  10/25/10 OJAG Supp. Op. at 2 n.2.

The October 25, 2010 OJAG "supplemental" advisory opinion also re-asserted the view that, even if 10 U.S.C. § 6388(b), as amended in 1968, applied to JAGC officers, it would not apply to Plaintiff because his first appointment to the Regular Navy was in the rank of lieutenant, not lieutenant (junior grade).  10/25/10 OJAG Supp. Op. at 3-4.  In addition it concluded that there was *no* substantive difference between the meaning of an "original" appointment and an "initial" appointment in Notice 1821: "*For purposes of paragraph 4(h)(1) of [Notice 1821] 'original' and 'initial' are synonymous.*"  10/25/10 OJAG Supp. Op. at 4 (emphasis added).  Examining SECNAVINST 1821.1 and Notice 1821, the OJAG concluded that the statement in Notice 1821 that the "AA" method applied to "original" appointments was "not legally precise, [but] it is nonetheless clear in the totality of the circumstances that the intent was 'original' meant first (or initial) appointment[.]"  10/25/10 OJAG Supp. Op. at 4.  Therefore, use of the "M" method to determine pre-DOPMA "total commissioned service" for JAGC officers, like Plaintiff, is consistent with the Navy's policy of "including inactive commissioned service time [including time in law school] when calculating total commissioned service for purposes of mandatory retirement."  10/25/10 OJAG Supp. Op. at 5 (citing a 1981 Navy JAG Memorandum, analyzing a draft of SECNAVINST 1821.1 and concluding that, in determining the date of mandatory retirement, time spent in law school under the JAGC Student Program should be included (AR 1340)).

On January 7, 2011, Plaintiff responded to the October 25, 2010 OJAG "supplemental" advisory opinion, criticizing it for "predictably" reversing course without providing a principled analysis of 10 U.S.C. § 6388(b), as amended in 1968.  *See* 3/16/11 *BCNR Dec*., Doc. 84, Encl. 20 at 3, 7.

---

[23] Plaintiff's comments focused on the inconsistency between the Navy's legal opinions on whether 10 U.S.C. § 6388(b), as amended in 1968, applied to JAGC officers first appointed into the Regular Navy as a lieutenant (junior grade).

On January 17, 2011, Plaintiff submitted a new record to the BCNR that Plaintiff had only recently obtained from the Navy with the assistance of Senator Jim Webb.  *See* 3/16/11 *BCNR Dec.*, Doc. 84, Encl. 22 at 9 (copy of an "ALNAV" electronic message that was transmitted at the time of Plaintiff's appointment into the Regular Navy in 1977 confirming Plaintiff's permanent appointment was to the rank "LTJG," with a temporary appointment as "LT.").

 **5. The March 16, 2011 Board For The Correction Of Naval Records Remand Decision.**

On March 16, 2011, the BCNR issued a decision concurring with the March 15, 2010 NPC advisory opinion and the October 25, 2010 OJAG supplemental advisory opinion, concluding that no method existed, prior to DOPMA, to determine Plaintiff's "total commissioned service."  *See* 3/16/11 *BCNR Dec.* at 6-7 ("[T]he Navy had determined that, due to JAGC accession policies, no statutory means of computing pre-DOPMA service for most JAGC officers existed under 10 USC [§] 6388.  This is because the very first appointment that a JAGC student program officer receives is not an appointment in the Regular Navy as is required by 10 USC [§] 6388(b).).  Therefore, the BCNR determined that the Navy correctly computed Plaintiff's "total commissioned service" under the M method set forth in SECNAVINST 1821.1. *See* 3/16/11 *BCNR Dec.* at 6-7.

 **C. Proceedings In The United States Court Of Federal Claims After March 16, 2011.**

On May 3, 2011, the court convened a status conference to ascertain how the parties wanted to proceed in light of the BCNR's March 16, 2011 Remand Decision.  On May 13, 2011, the court issued a Scheduling Order, amended on June 16, 2011 and again on June 29, 2011, to afford the parties the opportunity to submit briefs addressing BCNR's March 16, 2011 Remand Decision.

On July 4, 2011, Plaintiff filed "Objections To BCNR Decision" ("7/4/11 Pl. Obj.").[24] Thereafter, the Government requested three extensions to file a Response.  On August 26, 2011, the Government filed a Response To Plaintiff's July 4, 2011 Objections ("8/26/11 Gov't Obj. Resp.").  After two extensions, on September 26, 2011, Plaintiff filed a Reply To Government's Response To Plaintiff's July 4, 2011 Objections ("9/26/11 Pl. Obj. Reply").

**IV. DISCUSSION.**

Both parties agree that the administrative remedies afforded by the BCNR have been exhausted and this case is now ripe for adjudication of the Navy's 1982 interpretation of 10

---

[24] On July 15, 2011, the court sent a letter to Joseph M. Reisman, Chairman of the Federal Circuit Bar Association's Amicus Committee, requesting that the Committee consider submitting an *amicus curiae* brief to "assist the court with statutory and regulatory issues of first impression" presented by this case.  In December 2011, the court was informed that the Committee declined to participate in this matter at the trial level.

U.S.C. § 6388(b), as amended in 1968, and subsequent application of SECNAVINST 1821.1 to compute Plaintiff's mandatory retirement date as June 30, 2002, instead of June 30, 2007. 5/18/09 Gov't Resp. at 1-2; 7/4/11 Pl. Obj. at 37.[25]

### A.   Whether The Navy's 1982 Interpretation Of 10 U.S.C. § 6388(b), as Amended In 1968, Is Entitled To Deference.

### 1.   Governing Precedent.

In *Chevron U.S.A., Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the United States Supreme Court held that, if a statute speaks "to the precise question at issue," the lower federal court reviewing the statute is required to "give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43.  If the statute is "silent or ambiguous with respect to the specific issue," an agency's interpretation must be sustained, if it is "based on a permissible construction of the statute." *Id* at 843.

In determining whether an agency's interpretation of a statute "exceeds the bounds of the permissible," the Court in *Barnhart* v. *Walton*, 535 U.S. 212, 218 (2002), cited *United States* v. *Mead Corp.*, 533 U.S. 218 (2001), which advised the lower federal courts that:

> agencies charged with applying a *statute* necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. ["T]he well-reasoned views of the agencies implementing a statute 'constitute a *body of experience and informed judgment* to which courts and litigants may properly resort for guidance'" [and] "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer[.]'" *The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its*

---

[25] The parties' filings relevant to this Memorandum Opinion and Final Judgment include: the Government's August 3, 2007 Motion For Summary Judgment On The Administrative Record ("8/3/07 Gov't Mot."); Plaintiff's October 18, 2007 Cross Motion For Summary Judgment And Response ("10/18/07 Pl. Mot. & Resp."); Plaintiff's April 13, 2009 Brief ("4/13/09 Pl. Supp. Br."); and the Government's May 18, 2009 Response thereto ("5/18/09 Gov't Supp. Resp.").  All of these, and other, filings are listed in Court Exhibit A, attached hereto.

The Government's August 3, 2007 filing is styled as a Motion For Summary Judgment On The Administrative Record.  As the United States Court of Federal Claims has explained, there is "no such thing under former RCFC 56.1 (nor is there under RCFC 52.1), as properly construed." *Serco Inc.* v. *United States*, 81 Fed. Cl. 463, 480 n.21 (2008).  Since the underlying facts in this case are not in dispute, the court has considered both the Government's August 3, 2007 and Plaintiff's October 18, 2007 filings as Motions for Judgment on the Administrative Record. *See* RCFC 52.1.

> *consistency, formality, and relative expertness, and to the persuasiveness of the*
> *agency's position*[.]

*Mead*, 533 U.S. at 227 (internal citations omitted) (emphasis added).

### 2. The History And Text 10 U.S.C. § 6388(b), As Amended In (1968), And The Navy's 1982 Interpretation After DOPMA Was Enacted.

In conducting an independent analysis of the Navy's 1982 post-DOPMA interpretation of 10 U.S.C. § 6388(b), as amended in 1968, the court first looks to the history and text of that statute.

In 1960, the Navy became aware that, under 10 U.S.C. §6388(a) (1958), "some officers who have been on continuous active duty since their first appointment as ensigns or second lieutenants in a *reserve component* [had] more actual active commissioned service than 'total commissioned service' as presently defined." AR 1296. As a result, "total commissioned service" for an officer who entered the Navy through the Naval Reserve, as computed under 10 U.S.C. § 6388(a) (1958), could "produce inequitable results in some cases." AR 1294. The Navy then proposed legislation to amend 10 U.S.C. § 6388(a) (1958) to provide that "staff corps officers who have served continuously since their appointment as ensigns, in either the line or staff corps, in either the Regular Navy or the Naval Reserve, will compute their total commissioned service from June 30 of the fiscal year of their date of rank in the grade of ensign[.]" AR 1297. Congress did not enact that proposed legislation.

In 1967, when the Navy JAGC was established, "total commissioned service" continued to be computed, as it was since 1958, for all staff corps officers, based on the date a staff corps officer was "*originally appointed* in the grade of lieutenant (junior grade) or ensign in any staff corps of the Navy, who since that appointment served continuously on the active list of the Navy[.]" 10 U.S.C. § 6388(a) (1964) (emphasis added). At that time, Congress defined "original" to mean "with respect to the appointment of a member in the armed forces in a regular *or* reserve component, refers to his most recent appointment in that component that is neither a promotion nor a demotion." 10 U.S.C. § 101(35) (1964) (emphasis added) (reproduced at AR 1186). To date, "original" retains that same definition. *See* 10 U.S.C. § 101(b)(10) (2006). As such, any officer who transferred from a reserve component in the Navy to a regular component in the Navy had two "original" appointments: one in the Naval Reserve and one in the Regular Navy. In addition, in 1967, as well as after the 1968 Act was enacted, Congress continued to define the "active list of the Navy," as "the list of officers of the *Regular* Navy, other than retired officers, holding permanent appointments in grades above chief warrant officer, W-4." 10 U.S.C. § 5001(a)(9) (1964) (emphasis added). Therefore, the "total commissioned service" for an officer who transferred from the Naval Reserve into the Regular Navy was to be computed from June 30 of the year of his most recent "original appointment," *i.e.*, his "original appointment" into the *Regular* Navy. This is so, because "total commissioned service" for a Regular Navy staff corps officer was based on the amount of time spent "on the active list of the Navy," defined by Congress as time spent serving in the *Regular* Navy, since an officer's original appointment. *See* 10 U.S.C. § 6388(a) (1964).

In 1968, however, Congress amended 10 U.S.C. § 6388 (1964), by adding a new subsection (a), that provided:

> For the purpose of the preceding sections of this chapter, the total commissioned service of each officer on the active list of the Navy in the Supply Corps or the Civil Engineer Corps *who was initially appointed as a Regular or as a Reserve* in the grade of ensign in the line or any staff corps or in the grade of lieutenant (junior grade) in the Civil Engineer Corps and who has served continuously on active duty since that appointment shall be computed from June 30, of the fiscal year in which he accepted that appointment.

10 U.S.C. § 6388(a) (Supp. IV 1968) (emphasis added).

By the 1968 Act, the prior version of 10 U.S.C. § 6388(a) (1964), became a new Section 6338(b), as set forth below:

> For the purpose of the preceding sections of this chapter, the total commissioned service of each officer *initially* appointed in the grade of lieutenant (junior grade) or ensign in any staff corps of the Navy *except the Supply Corps and the Civil Engineer Corps*, who has since that appointment served continuously on the active list of the Navy, is computed from June 30 of the fiscal year in which he accepted that appointment.

10 U.S.C. § 6388(b) (1970) (emphasis added to highlight changes made by amendment).

Congress made no other change to the pre-1964 law regarding officers in the Navy JAGC. As such, "Congress [spoke] to the precise question at issue . . . [and] the intent of Congress [was] clear." *Chevron*, 467 U.S. at 842.

In 1981, Congress enacted DOPMA, which provided, in pertinent part:

> In the case of an officer for whom no means of computing *service creditable* in determining whether the officer is subject to involuntary retirement or discharge existed under the law in effect on the day before the effective date of [DOPMA], the amount of *creditable service* of such officer for such purpose for the period before the effective date of [DOPMA] *shall be determined under regulations prescribed by the Secretary of Defense, except that such an officer may not be credited with an amount of service less than the amount of his active commissioned service*.

DOPMA § 624(b) (emphasis added).

DOPMA § 624(b), however, did not identify whether or what armed service staff corps, if any, had "no means of computing service creditable" for their officers prior to September 15, 1981. Congress delegated that decision to the Navy. If the Navy determined that an officer's "service creditable," *i.e.*, "total commissioned service" could be computed under 10

U.S.C. § 6388(b), no further regulation was required.  If not, the Navy was authorized to address that issue by regulation.  The Navy chose the latter path.

In this case, the Government argues that the Navy's post-DOPMA interpretation of 10 U.S.C. § 6388(b), as amended in 1968, is that the deletion of the word "originally" and replacement with the word "initially" substantively was significant, since "initially" means "first."  5/18/09 Gov't Supp. Br. at 3.  As such, the Government insists that, from 1968 until the enactment of DOPMA in 1981, "total commissioned service" must be measured from an officer's *first* appointment in the Navy, which must be an appointment as a corps lieutenant (junior grade) or ensign in a staff corps of the Regular Navy in order to apply 10 U.S.C. § 6388(b), as amended in 1968, to that officer.  5/18/09 Gov't Br. at 3.  Therefore, the Government contends that, since Plaintiff's first appointment was as a line officer in the Naval Reserve, just like all other officers who joined the JAGC of the Naval Reserve through the JAGC Student Program, his "total commissioned service" could not be computed under 10 U.S.C. § 6388(b), as amended in 1968 because: "(1) the statute's applicability limitation requires affected officers to accept their first naval commission in the staff corps; and (2) due to accession policies unique to the JAGC, none of the officers in the JAGC satisfied that requirement." 5/18/09 Gov't Br. at 10. [26]  In other words, the Navy interpreted the "plain meaning" of "initially appointed" in 10 U.S.C. § 6388(b), as amended in 1968, to permit computation of "total commissioned service" only from the very first appointment an officer receives in *any* component of the Navy.

An alternate interpretation of the text of 10 U.S.C. § 6388(b), as amended in 1968, is that "initially appointed" modifies the phrase "in the grade of lieutenant (junior grade) or ensign," so that "total commissioned service" is computed from the time of a staff corps officer's "initial," *i.e.*, "first," appointment *in a Regular Navy staff corps*, at a rank of lieutenant (junior grade) or ensign. [27]  So interpreted, 10 U.S.C. § 6388(b), as amended in 1968, permits an officer's "total

_____

[26] It was not until the Acting Navy JAG's 1972 Memorandum that any Navy document indicated that JAGC accession policies made it impossible to match an officer in the JAGC with any other JAGC officer, under 10 U.S.C. § 6388(c) (1970), because every JAGC officer's very first appointment in any component of the Navy either was: (1) as an ensign in the line on inactive duty while attending law school or (2) as a lieutenant (junior grade) in the Naval Reserve.  AR 1376-77 (Acting Navy JAG 1972 Memorandum).

[27] A similar ambiguity is presented in the following sentence: "John initially traveled in an airplane in France."  The text could be interpreted to mean that the very first time that John traveled was the first time that he traveled (1) in an airplane *and* (2) in France.  This is how the Government interpreted 10 U.S.C. § 6388(b), as amended in 1968.  In the alternative, the example sentence presented could be interpreted to mean that John's first ever travel *in an airplane* took place while on a trip to France (even though it was not John's first trip to France).  Or, it might mean that the first mode of transportation that John used in France was an airplane (even though he had travelled on an airplane, on prior trips elsewhere).  The point is that the sentence has no "plain meaning" without reference to the statute's larger context.  *See, e.g.*, *Caraco Pharm. Labs., Ltd.* v. *Novo Nordisk A/S*, __ S. Ct. __, No. 10-844 (Apr. 17, 2012) (explaining that statutory language often has multiple meanings and that in such situations "we consider statutory text and context together").  The statutory text and structure of 10

commissioned service" to be computed in the same manner as it was prior to 1968, when the statute referred to an "original" appointment. This interpretation also rejects the Government's suggestion, in this case, that simply because Congress amended 10 U.S.C. § 6388, the one-word change from "originally" to "initially" was intended to be substantive. 5/18/09 Gov't Supp. Br. at 11. Both the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have rejected attempts by litigants to argue that unexplained minor amendments to a statute, enacted as part of a larger amendment, must be assumed to have substantive effect. *See United States* v. *Wilson*, 503 U.S. 329, 336 (1992) (holding the "general presumption that Congress contemplates a change whenever it amends a statute" was overcome where a statutory scheme otherwise would be rendered unworkable); *see also Pitsker* v. *Office of Personnel Management*, 234 F.3d 1378, 1383 (Fed. Cir. 2000) (same).

The Navy's statutory interpretation also is inconsistent with the internal structure of Section 6388(b), as amended in 1968. *See Timex V.I.* v. *United States*, 157 F.3d at 879, 882 (Fed. Cir. 1998) (identifying structure as relevant to statutory construction). Section 6388(b) requires that "total commissioned service" be computed, based on time spent serving "continuously on the active list of the Navy" since the officer's relevant "initial appointment." But continuous service on the "active list," by congressional definition, meant service in the Regular Navy. *See* 10 U.S.C. § 5001(9) (1970) ("'Active list of the Navy' means the list of officers *of the Regular Navy* . . . holding permanent appointments in grades above chief warrant officer[.]" (emphasis added)). Therefore, only an officer with an "initial appointment" in the Regular Navy could *ever* accumulate "total commissioned service" under 10 U.S.C. § 6388(b), as amended in 1968. The Navy's 1982 interpretation of the phrase "initial appointment," meant that a Regular Navy officer who begins his career in the Reserves does not have an "initial appointment" into the Regular Navy. Therefore, the Navy's interpretation leads to the counterintuitive result that 10 U.S.C. § 6388(b), as amended in 1968, does not apply to the entire JAG staff corps, all of whom started as Reserve officers.[28]

The Navy's interpretation of 10 U.S.C. § 6388(b), as amended in 1968, is also not consistent with the statute's structure. Section 6388(a) stated that, for members of the Supply and Civil Engineer Corps, "the total commissioned service of each officer on the active list of the

---

U.S.C. § 6388, as amended in 1968, suggest that "initially appointed" cannot refer only to an officer's first-ever appointment to any naval component.

[28] The Government also suggests that the Navy's interpretation of the 1968 Act amendments, as set forth in the 1972 Acting Navy JAG Memorandum, did not affect any other staff corps, except for JAGC. 5/18/09 Gov't Supp. Br. at 10. This assertion is not supported by the Administrative Record. As the 1972 Acting Navy JAG Memorandum stated, "the Judge Advocate General's Corps *and [officers] in other corps* have not accumulated any total commissioned service . . . ." AR 1376. Similarly, a 1982 JAG "Memo To File" suggested that the problems articulated in the 1972 Memorandum affected not only JAGC officers (AR 1385), but also Medical and Dental Corps officers (AR 1393). Moreover, the Navy calculated service dates for staff corps officers in 1982, under the "M" method for hundreds of Medical Corps officers (AR 1980-90), Dental Corps officers (AR 1993-2002), Medical Service Corps officers (AR 2005-16), and Chaplain Corps officers (AR 2026-31).

Navy . . . who was initially appointed *as a Regular or as a Reserve* in the grade of ensign in the line or any staff corps or in the grade of lieutenant (junior grade) in the Civil Engineer Corps and who has served continuously on active duty since that appointment shall be computed from June 30, of the fiscal year in which he accepted that appointment." 10 U.S.C. § 6388(a) (1970) (emphasis added). If, as the Government contends, the phrase "initially appointed" refers unambiguously to the very first appointment an officer received in any component, then the phrase, "as a Regular or as a Reserve," in Section 6388(a), as amended, would be surplusage. *See Duncan* v. *Walker*, 533 U.S. 167, 174 (2001) ("We are thus reluctan[t] to treat statutory terms as surplusage in any setting. We are especially unwilling to do so when the term occupies so pivotal a place in the statutory scheme[.]" (internal quotation marks and citations omitted) (alteration in original)).

For the reasons discussed, the court has determined that the Navy's 1982 interpretation of 10 U.S.C. § 6388(b), as amended in 1968, fails at "step one" of *Chevron,* because the statute is not ambiguous. *See Chevron*, 467 U.S. at 843 n.9 (instructing courts, at *Chevron* "step one," to "employ[] traditional tools of statutory construction" to "ascertain[] [if] Congress had an intention on the precise question at issue[.]"); *see also Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 138 (1990) ("To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute.")

Therefore, unless the legislative history shows otherwise, 10 U.S.C. § 6388(b) must be read to parallel 10 U.S.C. § 6388(a). Accordingly, the court's analysis proceeds to examine the legislative history. *See Watt* v. *Alaska*, 451 U.S. 259, 266 (1981) ("The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have their literal effect." (citing *Boston Sand Co.* v. *United States*, 278 U.S. 41, 48 (1928) (Holmes, J.))); *see also Timex V.I.,* 157 F.3d at 882 (stating that if the statute's text and structure "[do] not explicitly address the precise question, we do not at that point simply defer to the agency," but also look to the "legislative history").

### 3.      The Legislative History.

The legislative history of 10 U.S.C. § 6388(b), as amended in 1968, indicates that the Navy and Congress used the words "originally" and "initially" interchangeably, without designating any special meaning to the word "initially" or recognizing any significance of the statutory definition of "originally." *See* H.R. Rep. No. 90-1751 at 3 (1968) (describing the *pre-*1968 state of the law for computing "total commissioned service" as utilizing the date of an officer's "*initial* appointment in a staff corps" (emphasis added)) (adopting language verbatim from the Navy's 1968 letter to the Speaker of the House (reproduced at AR 1329)); S. Rep. No. 90-1490 at 3 (same). In addition, the legislative history evidences that there was no congressional intent to treat staff officers who began their career in the Naval Reserves differently than those who began as Regular Navy staff officers. Yet, the Navy's interpretation would require the court to assume that Congress intended to eliminate the Navy's ability to calculate "total commissioned service" for officers in JAGC as well as the other four staff corps whose "total commissioned service" is governed by 10 U.S.C. § 6388(b), as amended. The disruption to the Navy under this interpretation would be significant since junior staff corps officers who began their career in the Naval Reserves would receive *no* compensation if severed

from the Navy[29] and senior officers would *never* be subject to involuntary retirement, based upon their years of service.[30]  *See United Sav. Assoc.* v. *Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 380 (1988) ("[I]t is most improbable that [Congress would have made a major change] . . . without even any mention in the legislative history."); *see also Watt*, 451 U.S. at 271 n.13 (observing that although congressional silence "provide[s] a treacherous guide to its intent," it is "almost inconceivable that Congress knowingly would have changed substantially a long-standing formula for distribution of substantial funds without a word of comment."); *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U.S. 256, 266-67 (1979) (observing that when Congress is silent about a purported modification to "pre-existing rights," such "silence is most eloquent, for such reticence while contemplating an important and controversial change in existing law is unlikely. . . .  At the very least, one would expect some hint of a purpose to work such a change[.]").

The fact that the 1968 Act had a limited purpose is also confirmed by the Navy's proposed legislation and the accompanying House and Senate Reports.  For example, the Secretary of the Navy's June 3, 1968 two-page proposal to the Speaker of the House discusses the "purpose of the legislation," but does not mention the five staff corps covered by 10 U.S.C. § 6388(b), as amended in 1968.  AR 1329-30.  In addition, the House and Senate Reports, adopting the Secretary of Navy's statement of purpose verbatim, emphasized the limited scope of the proposed amendments.  *See* S. Rep. No. 90-1503 at 1 ("This bill is expected to affect only about two officers per year with respect to severance pay[.]"); *see also* H.R. Rep. No. 90-1751 at 2 ("The committee was assured that the bill as recommended by the Department would not have any impact on the promotion opportunity or promotion cycle of any of the officers concerned.  Its *sole* purpose is to eliminate the inequity which exists in present law." (emphasis added)).  In addition, the Secretary of the Navy's June 3, 1968 letter uses "initially" in a way that would be inapposite if the intent was to refer to an officer's first-ever appointment into a Navy component.  AR 1329 (describing the *pre*-amendment rule as: "[A] staff officer who had prior service in the line of the [Regular] Navy may count only his staff corps service in computing his total commissioned service if his *initial* appointment in a staff corps was in the grade of ensign or lieutenant (junior grade)." (emphasis added)).[31]  In addition, the title of the 1968 Act, *i.e.*, "An Act to amend title 10, United States Code, to correct an inequity affecting officers of the Supply

---

[29] This would be so, because severance pay for junior staff corps officer was based on two-months salary multiplied by years of "total commissioned service."  *See* 10 U.S.C. § 6382 (1970).  Thus, an officer who had served for several years, but never acquired "total commissioned service" under § 10 U.S.C. § 6388 would receive no severance pay.

[30] This would be so, because mandatory retirement was computed using "total commissioned service."  *See* 10 U.S.C. §§ 6376-80 (1970).  Thus, an officer who served for 30 years, but who acquired no "total commissioned service" during that time would not be subject to mandatory retirement.  Such an officer could only be forcibly retired under an alternate provision requiring that officers must be retired upon turning 62 years old.  *See* 10 U.S.C. § 6390(a) (1970).

[31] The Government dismisses the Navy's interchangeable use of "originally" and "initially," simply as "the imprecise use of military jargon by laypeople[.]"  5/18/09 Gov't Supp. Resp. at 8.

Corps and Civil Engineer Corps of the Navy" clearly indicated that it was intended *only* to affect Supply Corps and Civil Engineer Corps officers, not officers in other staff corps. *See Florida Dep't of Revenue* v. *Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (although a statute's title "cannot substitute for the operative text . . . . statutory title and section heads are tools available for the resolution of a doubt about the meaning of a statute.").

Moreover, the Government has suggested *no* reason why Congress, in enacting the 1968 Act, intended to allow the Navy to compute "total commissioned service" for staff officers who began their careers in the Regular Navy, but to prohibit it from treating JAGC officers who began their careers in the Naval Reserve differently. The Government's litigating rationale that the impact on JAGC Reserve officers was "necessarily unintentional," because Congress did not consider the newly-created JAGC accession policies (Gov't. Supp. Resp. at 9), is not supported by the legislative history and is not reasonable. *See Watts*, 451 U.S. at 273 (holding that *post hac* statutory interpretation is "entitled to considerably less deference."); *see also Pitsker*, 234 F.3d at 1384 (observing that, under the Government's interpretation of a statute, no federal law enforcement officers would ever receive certain monetary benefits: "This cannot be rationalized with the language, purpose and legislative history" and led to the absurd result that no such employee would ever receive the increased monetary benefits at issue).

The legislative history does indicate that Congress was concerned that no Navy officer, who enlisted prior to 1968, would be adversely affected by the amendments in the 1968 Act. To prevent that situation, "a savings clause [was included in the 1968 Act] which precludes any present Supply Corps or Civil Engineer Corps officer from being mandatorily retired in their present grades earlier than they would have been retired under existing law." 1968 Act, subsection 6. In 1970, Congress also made 10 U.S.C. § 6388(a) retroactive to assure that previously severed junior officers in the Supply and Civil Engineer Corps would receive the increased severance pay, afforded under 10 U.S.C. § 6388(a), as amended in 1968, on the same terms as current officers. *See* Act of Dec. 25, 1970, Pub. L. No. 91-582, 84 Stat. 1574 (1970). Therefore, it would be unreasonable for the court to infer that Congress intended to impact how "total commissioned service" was applied in determining a JAGC officer's retirement date, as well as other staff corps officers', without a word.

As to DOPMA, the legislative history of that Act reflects that the savings provision (DOPMA § 624(b)) was enacted to account for a "defect in current law [resulting in] no means of computing service for Navy staff officers." S. Rep. No. 96-1462 at 148. But DOPMA did not adopt or endorse the view, articulated in the 1972 and 1975 Acting Navy JAG Memoranda, that the Navy could not compute "total commissioned service" in 1968 for officers in the JAGC and other staff corps, as a result of the 1968 Act. In fact, there is no legislative history evidencing that Congress was even aware of the Acting Navy JAG Memoranda when DOPMA was enacted. It is clear that Congress delegated authority to the military Secretaries to issue regulations to determine the "amount of [an officer's] creditable service," prior to DOPMA, *i.e.*, "total commissioned service," but only *if* there was no statutory means of doing so. Congress did not authorize the Navy to misuse that authorization to change how "total commissioned service" could be computed prior to DOPMA, in order to force the early retirement of JAGC officers and deny them full monetary benefits for their service, to advance the careers of younger JAGC officers.

####        4.        Other Relevant *Mead* Factors.

In addition to the history, text, statutory context, and legislative history, *Mead* listed several other factors to be weighed by the court in determining the amount of deference, if any, to be afforded an agency's interpretation of a statute that it administers.  *See Mead*, 533 U.S. at 228.  Among those are "the degree of the agency's care," "persuasiveness of the agency's position," "consistency," and "formality."  *Id.*

####        a.        The Navy's "Degree Of Care" And "Persuasiveness" Of The Navy's Interpretation.

There are only two interpretive documents in the Administrative Record that reflect the Navy's "degree of the care" and "persuasiveness" in interpreting 10 U.S.C. § 6388(b), as amended in 1968, prior to the effective date of DOPMA on September 15, 1981.

The first interpretative document is the 1972 Acting Navy JAG Memorandum.  That Memorandum, however, does not mention, much less discuss, why "initially" was substituted for "originally" in the 1968 Act or whether any substantive import should be afforded this change.  AR 1375 ¶ 4.b.  In addition, although the 1968 Act was initiated at the request of the Navy, the 1972 Acting Navy JAG Memorandum neither cites nor discusses any contemporaneous internal documents explaining any substantive reason why the Navy requested this change in 1968.  Moreover, nothing in this document supports the Government's position that the replacement of "originally" with "initially" fundamentally changed the meaning of this statute.  *See Cathedral Candle Co.* v. *ITC*, 400 F.3d 1352, 1365-67 (Fed. Cir. 2005) (requiring a court to defer to an agency's statutory interpretation, "if the agency has conducted a *careful analysis* of the statutory issue . . . even if we might not have adopted that construction without the benefit of the agency's analysis." (emphasis added)).   The second interpretative document is the 1975 Acting Navy JAG Memorandum that adopted the same view as the 1972 Memorandum without further analysis.  AR 1380-81.

Neither of these Memoranda reflects a careful analysis by the agency nor are they persuasive.  *See Mead*, 533 U.S. at 228; *see also Watt* v. *Alaska*, 451 U.S. 259, 272-73 (1981) (holding that an agency's interpretation of amendments to its statute 10 years after the change was undermined the fact that it did not initially interpret the amendments in the same fashion, "particularly . . . because the Department first proposed the amendment.").

####        b.        The "Consistency" Of The Navy's Statutory Interpretation.

Deference also should be afforded an agency's statutory interpretation if it is consistent with "agency interpretation of 'longstanding' duration."  *Barnhart*, 535 U.S. at 220; *see also Mead*, 533 U.S. at 227-28.  When the 1968 Act was passed, the Navy issued no regulations nor took any action indicating the Navy interpreted 10 U.S.C. § 6388(b), as amended, to mean that "total commissioned service" could not be determined for JAGC officers (or officers in the Medical Corps, Medical Services Corps, Dental Corps, and Chaplains Corps).  After the 1972 and 1975 Acting Navy JAG Memoranda were issued, the Navy again did not issue any

regulations nor take any action to endorse these views. In fact, a 2001 OJAG Opinion reached the opposite conclusion as the 1972 and 1975 Acting Navy JAG Memoranda. *See* 2001 OJAG Op. at 7 n.23. Notably, the 2001 OJAG Opinion is the *only* internal Navy document in the Administrative Record in which the author discusses the fact that the word "originally" was replaced by "initially" in the 1968 Act. *See I.N.S.* v. *Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the [federal agency] has taken through the years."); *see also Butterbaugh* v. *Dep't of Justice*, 336 F.3d 1332, 1341 (Fed. Cir. 2003) ("[S]hifting [agency] interpretations are entitled to less [deference.]").

In any event, none of these internal JAG Memoranda reflect a "longstanding," consistent position of the Navy, as expressed through the Secretary.

### c.     The "Formality" Of The Navy's Interpretation.

Neither the Acting Navy JAG 1972 nor 1975 internal Memoranda were regulations issued under the Secretary's authority and therefore lack the imprimatur of "formality." *See Mead*, 533 U.S. at 228, 230-31; *see also Alaska Dep't of Envtl. Conservation* v. *EPA*, 540 U.S. 461, 487-88 (2004) (citing *Christensen* v. *Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in . . . policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.")). Moreover, such internal agency memoranda typically are not entitled to deference, particularly when they concern "agency personnel policies" that are "never exposed to the light of formal rulemaking, but remain[] embedded in policy statements, handbooks, directives, and the like." *Butterbaugh*, 336 F.3d at 1340-41; *see also Eldredge* v. *Dep't of Interior*, 451 F.3d 1337, 1342 (Fed. Cir. 2006) (holding that Office of Personnel Management advisory opinions and handbooks are not entitled to deference).

### 5.     The Court's Disposition.

For the above-stated reasons, the court declines to construe 10 U.S.C. § 6388(b), as amended in 1968, to prohibit officers who began their career in the Naval Reserve from having their "total commissioned service" computed thereunder, because of the replacement of the word "originally" with "initially," without any comment by Congress. The court's interpretation is the same as that expressed in the 2001 OJAG advisory opinion – *that the Navy failed to disclose to Plaintiff* until it was revealed in the 2010 Navy JAG advisory opinion to the BCNR during the remand. *See* 2001 OJAG Op. at 7 n.23 ("An officer's first appointment *in a staff corps* is an original appointment; thus, substituting 'initially' for 'originally' would not alter the meaning of the statute [*i.e.*, 10 U.S.C. § 6388(b), as amended in 1968]." (emphasis added)).

Therefore, the court has determined that, prior to DOPMA, "total commissioned service" for an officer in the Regular Navy JAGC *or* the Naval Reserve JAGC could have and should have been computed under 10 U.S.C. § 6388(b), as amended in 1968, consistent with the stated policy of the Navy, "to provide equality of treatment for all officers of the Regular Navy . . , *regardless of the source* from which procured[.]" AR 1294 (Feb. 12, 1960, Deputy Secretary of the Navy letter to the Speaker of the House of Representatives) (emphasis added).

Because the BCNR relied upon the Navy's erroneous interpretation of 10 U.S.C. § 6388, as amended in 1968, to compute Plaintiff's "total commissioned service," the 3/16/11 *BCNR Decision* also erroneously construed the statute and thus, by definition, is arbitrary, capricious, and contrary to law. *See Roth* v. *United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) ("The Court of Federal Claims reviews a Board decision to determine if it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."); *see also id.* ("'[W]hen a correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate.'" (quoting *Yee* v. *United States*, 206 Ct. Cl. 388 (1975))).

### B.   Whether SECNAVINST 1821.1 Is "Arbitrary Or Capricious In Substance."

Although the court has determined that the Navy's interpretation of 10 U.S.C. § 6388(b), as amended in 1968, is contrary to the text, legislative history, and other *Mead* factors, in the alternative, the court has determined that SECNAVINST 1821.1 is arbitrary and capricious in that it discriminates against individuals who enlisted in the Naval Reserve through the JAGC Student Program at the beginning of law school, as compared to those who enlisted in the Regular Navy JAGC after graduation from law school.

As a matter of law, where Congress "'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation' . . . [that is] binding in the courts unless procedurally defective, arbitrary and capricious in substance, or manifestly contrary to the statute." *Mead*, 533 U.S. at 227 (quoting *Chevron*, 467 U.S. at 843-44).

SECNAVINST 1821.1 reflects the Navy's conclusory interpretation that

> certain Regular officers in the . . . Judge Advocate General's Corps do not have matching officers who satisfy all the criteria of section 6388. Accordingly, it is not possible under the laws in effect prior to 15 September 1981 to compute total commissioned service for those Regular officers in those staff corps.

SECNAVINST 1821.1 ¶ 3.b (AR 1272).

The mechanism for computing "total commissioned service" under SECNAVINST 1821.1 begins by "matching" an officer whose "total commissioned service" cannot be computed under 10 U.S.C. § 6388, as amended in 1968, with an officer from another component of the Navy for purposes of determining "date of rank" and "total commissioned service." *See* SECNAVINST 1821.1 ¶¶ 6.a.1-2. The "matched" officer's "date of rank" is then adjusted forward for each year of "constructive service credit" awarded to the officer, resulting in a later "date of rank," and a later mandatory retirement date. *See* SECNAVINST 1821.1 ¶ 6.a.3; *see also id.* ¶ 5.d (defining "constructive service credit").

Each officer beginning his career in the JAGC as a reserve officer, however, was entitled to at least three years of "credit," granted "[f]or the purposes of determining lineal position, permanent grade, seniority in permanent grade, and eligibility for promotion[.]"   10

U.S.C. § 5578a (1976).  The Navy has determined, however, that "10 U.S.C. § 5578a credit," is not equivalent to "constructive service credit," and should not be added to an officers "date of rank" in computing his mandatory retirement date.  *See* SECNAVINST 1821.1 ¶ 5.d; *see also* 3/16/11 *BCNR Dec.* at 13 ("[T]he [OJAG] 'located no instruction or regulation applicable to [Plaintiff] that would dictate three years of constructive service credit[.]" (quoting 2010 Supp. OJAG. Op.)).  Instead, for an officer like Plaintiff who enlisted in the Naval Reserve at the beginning of law school through the JAGC Student Program, the three years of required "10 U.S.C. § 5578a credit" were received in the form of "commissioned service credit," for the three years he spent as an officer on inactive duty during law school.  *See* SECNAVINST 1821.1 ¶ 5.d; *see also* 3/16/11 *BCNR Dec.* at 16 (adopting the same reasoning as 2010 NPC Op.).  In contrast, "constructive service credit" was awarded only to officers who did *not* have three years of "commissioned service credit," *i.e.*, to JAGC officers who enlisted after law school graduation.  As a result, the Navy treated individuals with the same professional credentials entering the Navy JAGC in a different manner, ironically prejudicing those who make an earlier commitment to serve their nation by enlisting in the Naval Reserve at the start of law school.  *See* Notice 1821 at AR 1281-85 (assigning Navy JAGC officers different amounts of "constructive service credit" between 0-3 years).

It is important to recognize that an earlier draft of SECNAVINST 1821.1 recognized and sought to avoid this problem.  AR 1339-41 (Nov. 18, 1981 JAG Memorandum discussing an early draft of SECNAVINST 1821.1).  Although the Administrative Record does not include a copy of this draft, the record indicates that it included language that would have adjusted the "date of rank" for officers like Plaintiff forward by three years.  AR 1339.  In other words, "total commissioned service" and "date of rank" would have been computed for a student who entered the Naval Reserve through the JAGC Student Program and subsequently transferred into the Regular Navy in the JAGC *in the same manner* as a lawyer who first graduated from law school and then entered the Regular Navy JAGC.  The November 18, 1981 Navy JAG Memorandum, however, rejected that draft, because "it is considered in the best management interest of the staff corps of the Navy to compute total commissioned service in a manner which allows each staff corps to select those officers *who should be retired* . . . based upon the particular needs of the staff corps at the time."[32]  AR 1340 (emphasis added).  That view prevailed.

---

[32] The November 18, 1981 Navy JAG Memorandum to the Director, Military Personnel Policy Division reasoned:

The United States Supreme Court has explained that, even when an agency has been granted broad discretion to regulate, it "still . . . must do so in some rational way." *Judulang* v. *Holder*, 132 S. Ct. 476, 485 (2011).  If an agency's regulations discriminate among two regulated entities

> by flipping a coin . . . we would reverse the policy in an instant. That is because agency action must be based on non-arbitrary, "relevant factors," which here means that the [agency's] approach must be tied, even if loosely, to the purposes of the [applicable] laws or the appropriate operation of the [statutory] system. . . . And that is true regardless whether the [agency] might have acted to limit [benefits to the regulated entity] on other, more rational bases.

---

> 3.  Because [SECNAVINST 1821.1] is designed for the purpose of computing years of service for involuntary retirement or discharge for certain Regular staff corps officers, it is considered in the *best management interest of the staff corps of the Navy* to compute total commissioned service in a manner which allows each staff corps to select those officers who should be retired or continue on active duty based upon the particular needs of the staff corps at the time.  Subtracting service as a commissioned officer in an active service status, but not on active duty, [*i.e.*, while attending law school after accepting a JAGC commission as a line officer], in a 19XX program will have the effect of *stifling promotion opportunity for highly qualified junior officers and will restrict management from selecting out, by a noncontinuation process, officers who may be marginal performers*.

> 4.  The majority of the accessions for the Judge Advocate General's Corps are commissioned through the JAG Student 1955 program.  While participating in this program, these officers receive full credit for their Reserve commissioned service for longevity pay purposes.  This fact in itself would tend to justify inclusion of such Reserve commissioned service in computing total commissioned service under [SECNAVINST 1821.1].  Additionally, given the control grade ceilings in effect . . . it will become increasingly important in the upcoming years for each staff corps to have maximum management flexibility relative to the continuation of senior grade officers.  Reducing that control by automatically allowing officers accessed as 19XXs to avoid facing continuation-board action, for up to three years, in the case of the Judge Advocate General's Corps, seriously reduces the benefits of an effective management tool.  Accordingly, *it is the recommendation of the Judge Advocate General that the language . . . of [the draft of SECNAVINST 1821.1] concerning exclusion from an officer's total commissioned service of periods of service as a commissioned officer in an active status, but not on active duty, while in a student program, be deleted*.

AR 1340 (emphasis added).

*Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)).

The same principles should govern this case. DOPMA § 624(b) authorized the Navy to compute "total commissioned service" for officers for whom there was no statutory mechanism to conduct this computation. To be sure, Congress looked to the Navy to make that determination. But if SECNAVINST 1821.1 was written to retire staff corps officers by granting them different amounts of "constructive service credit" based on "flipping a coin" or beginning with the letter of the month of the officer's enlistment in the Navy, such a result would be held to be arbitrary or capricious. Yet this is effectively what the Navy did. It elected to link an officer's mandatory retirement date to the unrelated issue of whether that officer chose to enlist in JAGC on entering law school or after graduation. There is no rational reason for such discrimination.[33] *See Judulang*, 132 S. Ct. at 483 n.7 (explaining that "our analysis would be the same [under *Chevron* step two], because we ask whether an agency's interpretation is "arbitrary or capricious in substance"").

### C.    Plaintiff's Mandatory Retirement Date Should Be Computed Under 10 U.S.C. § 6388(b), As Amended In 1968.

Plaintiff received a permanent appointment into the Regular Navy on September 20, 1977. AR 1156. This appointment was in the rank of lieutenant (junior grade). AR 1156. Thus, pursuant to 10 U.S.C. § 6388(b), as amended in 1968, Plaintiff was "initially appointed in the grade of lieutenant (junior grade)" in the Regular Navy JAGC, on September 20, 1977. *See* 10 U.S.C. § 6388(b) (1970). In addition, the Administrative Record evidences that Plaintiff "served continuously on the active list of the Navy" since that date.[34] AR 1166; *see also, e.g.*, AR 1441, 1445, 1448, 1452, 1459, 1462.

Therefore, his mandatory retirement date should have been computed, "from June 30 of the fiscal year[35] in which he accepted" an appointment to the Regular Navy, *i.e.*, June 30, 1977.

---

[33] The Government contends that it was reasonable for the Navy to compute Plaintiff's time in law school towards his mandatory retirement, particularly in light of the fact that he accumulated seniority credits for promotion and longevity pay during that same time. 5/18/09 Gov't Supp. Resp. at 13-14 (citing AR 1339-41). The same is true, however, for officers who enlist in JAGC after law school. *See* 10 U.S.C. §§ 5578a (1982), 5600(b)(1)(D) (1982) ("[A] person appointed in the Naval Reserve in any of the following corps shall be credited with at least the following amounts of service in an active status: . . . Judge Advocate General's Corps – 3 years[.]"). Therefore, the Government's explanation for determining their pre-DOPMA "total commissioned service" provides no justification for discriminating between the two types of staff corps officers.

[34] Again, the "active list of the Navy" is defined by statute as "the list of officers of the Regular Navy, other than retired officers, holding permanent appointments in grades above chief warrant officer, W-4." *See* 10 U.S.C. § 5011(a)(9) (1976); *see also, e.g.*, AR 1438-62.

[35] Since 1976, the Government's fiscal year begins on October 1. *See* 2 U.S.C. § 631 (1976) (codifying Pub. L. No. 93-344, Title III, § 300). Accordingly, since Plaintiff received his

*See* 10 U.S.C. § 6388(b) (1970). This would result in a mandatory retirement date of June 30, 2007, *i.e.*, 30 years from June 30, 1977. *See* 10 U.S.C. § 634(a) (providing that a captain in the Regular Navy who is not recommended for promotion will mandatorily be retired after 30 years of active commissioned service). Neither the Government nor the BCNR contests that Plaintiff's proper retirement date should be June 30, 2007, if 10 U.S.C. § 6388(b), as amended in 1968, applies to Plaintiff. *See generally* 3/16/11 *BCNR Dec.*; *see also* Gov't Mot.; 5/18/09 Gov't Supp. Br.

For these reasons, Plaintiff is entitled to active duty back pay from July 1, 2002, the date on which he was unlawfully retired, until June 30, 2007, when he properly would have been subject to mandatory retirement, subject to an offset for any pension paid to Plaintiff by the Navy during this time. In addition, since a retirement date of June 30, 2007 would result in Plaintiff having accumulated over 30 years of active commissioned service, he is entitled to the commensurate increase in his monthly pension benefits from July 1, 2007 forward, pursuant to 10 U.S.C. §§ 1401, 1409. In addition, Plaintiff also is entitled to have his military records corrected to reflect the correct "total commissioned service" and mandatory retirement dates. *See Roth* v. *United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (quoting *Yee* v. *United States*, 206 Ct. Cl. 388 (1975)).

## V.  CONCLUSION.

For these reasons, the Government's August 3, 2007 Motion For Summary Judgment On The Administrative Record is denied. Plaintiff's October 18, 2007 Cross-Motion For Judgment On The Administrative Record is granted. This case is remanded to the BCNR to correct Plaintiff's records to reflect that his proper retirement date should be June 30, 2007, instead of July 1, 2002, and to facilitate the payment of active duty back pay owed and any commensurate increase in monetary retirement benefits.

Plaintiff's July 12, 2007 Motion For Default Judgment is denied as moot.

**IT IS SO ORDERED.**

  s/ Susan G. Braden        
SUSAN G. BRADEN
Judge

---

appointment in the Regular Navy on September 20, 1977, his mandatory retirement should be calculated from June 30 of that fiscal year, *i.e.*, June 30, 1977.

**COURT EXHIBIT A**

**Pleadings And Administrative Documents Cited In The Court's Memorandum Opinion**

| Date | Author | Name of Document | Abbreviation | Citation |
|---|---|---|---|---|
| 8/17/1972 | Acting Navy JAG | Memorandum For The Chief Of Naval Personnel | Acting Navy JAG 1972 Memorandum | AR 1374-79 |
| 1/21/1975 | Acting Navy JAG | Memorandum For The Chief Of Naval Personnel | Acting Navy JAG 1975 Memorandum | AR 1380-81 |
| 1/29/1982 | Secretary of the Navy | SECNAVINST Instruction 1821.1 NMPC-22/Pers-481 | SECNAVINST 1821.1 | AR 1271-77 |
| 12/13/1982 | Naval Personnel Command | NAVMILPERSCOM Notice 1821 | Notice 1821 | AR 1278-85 |
| 10/26/2001 | Office of the Judge Advocate General | Legal Opinion On Computation Of Total Commissioned Service | 2001 OJAG Op. | 3/16/11 *BCNR Dec.*, Doc. No. 84, Encl. 4 |
| 5/5/2004 | Assistant Legal Counsel, Naval Personnel Command | Comments And Recommendation In Case Of CAPT Frank J. Prochazka | 2004 NPC Op. | AR 107-12 |
| 5/11/2004 | Board For The Correction of Naval Records | BCNR Decision Memorandum | 5/11/04 *BCNR Dec.* | AR 1067 |
| 12/6/2006 | Plaintiff | Complaint | Compl. | Docket No. 1 |
| 02/05/2007 | Plaintiff | Amended Complaint | Am. Compl. | Docket No. 4 |
| 07/12/2007 | Plaintiff | Motion for Default Judgment | n/a | Docket No. 16 |
| 08/03/2007 | Government | Motion To Dismiss, Or, In The Alternative, Motion For Summary Judgment On The Administrative Record | Gov't Mot. | Docket No. 23 |
| 10/18/2007 | Plaintiff | Cross Motion For Judgment On The Administrative Record And Response | Pl. Mot. & Resp. | Docket No. 32 |
| 11/26/2007 | Government | Response And Reply To Cross Motion | 11/26/07 Gov't Reply | Docket No. 38 |
| 12/20/2007 | Plaintiff | Reply To Response To Cross Motion | 12/20/07 Pl. Reply | Docket No. 41 |

| Date | Author | Name of Document | Abbreviation | Citation |
|---|---|---|---|---|
| | | | | |
| 8/6/2008 | National Veterans Legal Services Program | Amicus Brief | Amicus Br. | Docket No. 48 |
| 9/17/2008 | Government | Response To Amicus Brief | 9/17/08 Gov't Resp. | Docket No. 53 |
| 9/17/2008 | Plaintiff | Response to Amicus Brief | 9/17/08 Pl. Resp. | Docket No. 55 |
| 4/13/2009 | Plaintiff | Supplemental Brief | 4/13/09 Pl. Supp. Br. | Docket No. 63 |
| 5/18/2009 | Government | Response to Plaintiff's Supplemental Brief | 5/18/09 Gov't Supp. Resp. | Docket No. 69 |
| 6/22/2009 | Plaintiff | Reply To Response To Supplemental Brief | 6/22/09 Pl. Reply | Docket No. 75 |
| 12/10/2009 | The Court | *Prochazka* v. *United States* (remanding to BCNR) | *Prochazka I* | 90 Fed. Cl. 486 (2009) |
| 3/15/2010 | Deputy Legal Counsel, Naval Personnel Command | Advisory Memorandum | 2010 NPC Op. | 3/16/11 *BCNR Dec.*, Encl. 3 |
| 3/26/2010 | Office of the Judge Advocate General | Advisory Opinion (incorporating 2001 OJAG Op. by reference) | 2010 OJAG Op. | 3/16/11 *BCNR Dec.*, Encl. 4 |
| 10/25/2010 | Office of the Judge Advocate General | Supplemental Advisory Opinion | OJAG Supp. Op. | 3/16/11 *BCNR Dec.*, Encl. 13 |
| 3/16/2011 | Board For The Correction Of Naval Records | BCNR Decision Memorandum | 3/16/11 *BCNR Dec.* | Docket No. 84 |
| 7/4/2011 | Plaintiff | Plaintiff's Objections To BCNR Decision | 7/4/11 Pl. Obj. | Docket No. 91 |
| 8/26/2011 | Government | Response To Plaintiff's Objections To BCNR Decision | 8/29/11 Gov't Obj. Resp. | Docket No. 98 |
| 9/26/2011 | Plaintiff | Reply To Response To Supplemental Brief Regarding Objections To BCNR Decision | 9/26/11 Pl. Obj. Reply | Docket No. 103 |